Ben F. Pierce Gore (SBN 128515)
PRATT & ASSOCIATES
1871 The Alameda, Suite 425
San Jose, CA 95126
Telephone: (408) 429-6506
Fax: (408) 369-0752
pgore@prattattorneys.com

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SARAH SAMET and JAY PETERS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PROCTER & GAMBLE COMPANY, KELLOGG COMPANY  and KELLOGG SALES COMPANY <br><br> Defendants. | Case No.  5:12-CV-01891-PSG <br><br> **SECOND AMENDED CLASS ACTION AND REPRESENTATIVE ACTION COMPLAINT FOR DAMAGES, EQUITABLE AND INJUNCTIVE RELIEF** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs, Sarah Samet and Jay Peters, ("Plaintiffs") through their undersigned attorneys, bring this lawsuit against Defendants Procter & Gamble Company and Kellogg Sales Company ("P&G" and "Kellogg" or "Defendants") as to their own acts upon personal knowledge and as to all other matters upon information and belief.

     1.     "Class Period" is April 16, 2008 to the present.

     2.     "Purchased Products" are those products that were purchased by Plaintiffs during the Class Period.  Plaintiff Sarah Samet purchased Pringles Original snack chips (6.41 oz cylinder); Pringles 18 Variety Pack (original, cheddar cheese and sour cream and onion .74 oz. tubs); and Pringles 8 Pack (sour cream and onion .74 oz. tubs).  Additionally, Plaintiff Jay Peters purchased Pringles Original snack chips (6.41 oz cylinder) and the following Kellogg's products: MorningStar Farm Hickory BBQ Riblets (10 oz. box); and Fruity Snacks (Mixed Berry 8 oz.

box).  Pictures of the Purchased Products are attached as Exhibits 1-5 and specific descriptions of the labels are included below.

3.     "Class Products" are the Purchased Products and Defendants' other products that bear the identical unlawful and/or misleading label statement(s).

## SUMMARY OF THE CASE

### A.     Unlawful Prong of the UCL

4.     Plaintiffs' case has two distinct facets.  First, the "UCL unlawful" part. Plaintiffs' first cause of action is brought pursuant to the unlawful prong of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL").  Plaintiffs allege that Defendants package and label the Purchased Products in violation of California's Sherman Law which adopts, incorporates, and is, in all relevant aspects, identical to the federal Food Drug & Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA").  These violations do not require a finding that the labels are "misleading" and render the Purchased Products "misbranded."

5.     Under California law, a food product that is misbranded cannot legally be manufactured, advertised, distributed, held or sold.  Misbranded products cannot be legally sold or possessed, have no economic value and are legally worthless.  Indeed, the sale or possession of misbranded food is a criminal act in California.  The sale of misbranded products is illegal under federal law and can result in the seizure of misbranded products and the imprisonment of those involved.

6.     California law is clear that reliance by Plaintiff or the class members is not a necessary element for a UCL plaintiff to prevail. *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011)(explaining that a California state law claim under the UCL focuses on "defendant's conduct," rather than any reliance by plaintiff or individualized proof of deception or injury); *see also Ries v. Arizona Beverages USA, LLC*, 287 F.R.D. 523, 537-38 (N.D. Cal. 2012)(stating liability is imposed and relief available under the unlawful prong "without individualized proof of deception, reliance, and injury."); *In re Tobacco II Cases*, 46 Cal. 4th 298, 325, fn 17 (Cal. 2009))("We emphasize that our discussion of causation in this case is limited to such cases where, as here, a UCL action is based on a fraud theory involving false advertising and

1   misrepresentations to consumers. The UCL defines "unfair competition" as "includ[ing] any

2   unlawful, unfair or fraudulent business act or practice …." (§ 17200) There are doubtless many

3   types of unfair business practices in which the concept of reliance, as discussed here, has no

4   application."); *Medrazo v. Honda of North Hollywood*, 2012 Cal. App. LEXIS 2316 at *21 (Cal.

5   App. March 21, 2012) ("the Supreme Court also explained that an actual reliance requirement

6   does not apply to UCL actions that are not based upon a fraud theory"); *Steroid Hormone*

7   *Product Cases*, 181 Cal. App. 4th 145, 159 (Cal. App. 2d Dist. 2010)(holding that

8   'California courts have repeatedly held that relief under the UCL is available without

9   individualized proof of deception, reliance and injury.'); *Frezza v. Google Inc.*, 2013 U.S. Dist.

10   LEXIS 57462 (N.D. Cal. Apr. 22, 2013)(". . . no reliance is required to prove violations of the

11   UCL based on "unlawful" or "unfair" conduct."); *Olivera v. Am. Home Mortg. Servicing, Inc.*,

12   689 F. Supp. 2d 1218, 2010 U.S. Dist. LEXIS 5129 (N.D. Cal. 2010) ("For claims based on the

13   "unfair" or "unlawful" prong of the UCL claim, courts have held that the plaintiff need not allege

14   reliance on misrepresentations, and may allege 'causation more generally.'"); *Rand v. Am. Nat'l*

15   *Ins. Co.*, 2010 U.S. Dist. LEXIS 82584 (N.D. Cal. June 22, 2010)("Moreover, reliance is only

16   required under the fraud prong of the UCL, and is not an element under the "unfair" or "unlawful"

17   prongs of that statute'); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 2007 U.S. Dist.

18   LEXIS 38068 (N.D. Cal., May 11, 2007)("Plaintiffs need not allege reliance.…However, where,

19   as here, plaintiffs allege that they were harmed by other types of misconduct actionable under the

20   UCL the Court finds no basis for requiring reliance on misrepresentations."); "[t]here are a

21   number of theories that have been litigated and rejected as defenses to claims alleging 'unlawful'

22   business practices . . . . Lack of Deception No Defense: That no one was actually deceived by the

23   practice is not a defense to a section 17200 "unlawful" business practice claim. Stern, § 5.166,

24   BUS. & PROF. C. § 17200 PRACTICE (The Rutter Group 2012).

25       7.    Thus "misbranding" – standing alone without any allegations of deception by

26   Defendants, or review of or reliance on the labels by Plaintiffs – gives rise to Plaintiffs' first

27   cause of action under the UCL.  In short, Defendants' unlawful conduct is the only necessary

28   element needed for UCL liability. All Plaintiffs need to show is that they bought an unlawful

1  product. This claim does not sound in fraud.

2      8.    Under California law, which is identical to federal law, Defendants' products listed

3  below are unlawful because they are misbranded due to violations of the Sherman Law, as alleged

4  herein:

| Purchased Product | Unlawful Label Statements | Sherman Law Violation (directly or through incorporation of FDCA) |
|---|---|---|
| Pringles Original (6.41 oz cylinder); Pringles 18 Variety Pack (original, cheddar cheese and sour cream and onion .74 oz tubs); Pringles 8 Pack (sour cream and onion .74 oz tubs) | "0g Trans Fat"/Omitted Disclosure Healthy "Wholesome" Slack Fill | 21 C.F.R. § 1.21 21 C.F.R. § 101.13 21 C.F.R. § 101.65 Cal. Health & Safety Code § 110100 Cal. Health & Safety Code § 110660 Cal. Health & Safety Code § 110670 Cal. Health & Safety Code § 110705 Cal. Health & Safety Code § 110760 |
| Kellogg's Morning Star Farms Hickory BBQ Riblets (10 oz. box) | "Evaporated Cane Juice" | 21 C.F.R. § 1.21 21 C.F.R. § 101.4 21 C.F.R. § 102.5 Cal. Health & Safety Code § 110100 Cal. Health & Safety Code § 110660 Cal. Health & Safety Code § 110725 Cal. Health & Safety Code § 110760 |
| Kellogg's Fruity Snacks (Mixed Berry 8 oz. box) | Fortified Slack Fill | 21 C.F.R. § 1.21 21 C.F.R. §104.20 Cal. Health & Safety Code § 110100 Cal. Health & Safety Code § 110660 Cal. Health & Safety Code § 110760 |

23      9.    Defendants' products which are substantially similar and have the identical

24  unlawful label statements as the Purchased Products are also unlawful under California and

25  federal law. The misbranding of those labels is uniform with the unlawful statements of Plaintiffs'

26  Purchased Products, and they likewise violate the Sherman Law.  In other words, a product

27  labeled with the term "evaporated cane juice," for example, is unlawful regardless of on what

28  product it is shown. The Sherman Law does not differentiate between products; it governs labels.

1   Thus, an unlawful labeling statement is unlawful regardless of whether it is on cereal or BBQ

2   riblets. Because such unlawful labeling statements result in products being misbranded and illegal

3   to sell or possess, a separate, independent violation of the unlawful prong is possible and has

4   occurred in this case.

5        10.    Defendants also violated the Sherman Law provisions listed in paragraphs 142-157

6   by manufacturing, offering to sell, selling, delivering, etc. misbranded food. As discussed below,

7   the illegal sale of a misbranded product to a consumer results in an independent violation of the

8   unlawful prong that is separate and apart from the underlying unlawful labeling practice that

9   resulted in the product being misbranded.

10  **B.     Misleading Prong of the UCL**

11       11.    Second, the "misleading" part. In addition to being unlawfully misbranded under

12  the Sherman Law, the illegal statements contained on the labels of the Purchased Products and the

13  Class Products are also misleading, deceptive and fraudulent.   Prior to purchase, Plaintiffs

14  reviewed the illegal statements on the labels of the Purchased Products, reasonably relied in

15  substantial part on the unlawful label statements, and were thereby misled in deciding to buy the

16  Purchased Products.  Plaintiffs were deceived into purchasing the products because of

17  Defendants' unlawful statements of the healthy qualities and sugar content of those products.

18  Defendants also misled Plaintiffs into believing that the products were legal to purchase and

19  possess. Had Plaintiffs known that these food products were misbranded they would not have

20  bought them. Plaintiffs relied on the Defendants' implicit representations that their products were

21  legal to sell and possess. Because this was not true, Plaintiffs were misled.

22       12.    All of the Purchased Products and the Class Products have labels that are unlawful.

23  Plaintiffs did not know, and had no reason to know, that Defendants' Purchased Products were

24  misbranded under the Sherman Law and bore food labeling claims that failed to meet food

25  labeling requirements. In addition, Plaintiffs were misled by the label statements on Defendants'

26  Purchased Products.

27

28                          **BACKGROUND**

13.     Every day, millions of Americans purchase and consume packaged foods. Identical federal and California laws require not only that label statements not mislead consumers but also require that the labeling statements be lawful. This case is about food companies that flout those laws. The law is clear: misbranded food cannot legally be manufactured, held, advertised, distributed or sold. Misbranded food has no economic value and is worthless as a matter of law, and purchasers of misbranded food are entitled to a refund of their purchase price.

14.     Defendants manufacture, market and sell a variety of foods, including the Purchased Products and the Class Products.

15.     Defendants have implemented a campaign to label their products as healthy and associated with wellness.

16.     Defendants recognize that health and wellness claims drive food sales, and actively promote the purported health benefits of their products, notwithstanding the fact that these promotions violate California and federal law.

17.     If a manufacturer is going to make a claim on a food label, it must not violate certain California laws. Manufacturers must ensure that consumers are not misled by food labels. Defendants have made, and continue to make, unlawful labeling claims in violation of federal and California laws that govern the types of representations that can be made on food labels. Defendants' product labels violate California law and therefore are misbranded.

18.     These California food labeling laws recognize that reasonable consumers are likely to choose products claiming to have a health or nutritional benefit over otherwise similar food products that do not claim such benefits.  More importantly, these laws recognize that it is deceptive to fail to disclose the presence of risk increasing nutrients, because it conveys a message to consumers that a food makes only positive contributions to a diet, or does not contain any nutrients at levels that raise the risk of diet-related disease or health-related condition. Plaintiffs were deceived by Defendants' unlawfully conveyed statements.

19.     Plaintiffs' claims are brought under California statutes and for violations of the Sherman Law.  Under California law, which is identical to federal law, the labels and labeling of Defendants' products included in the class are unlawful and misleading due to the following

conduct:

A. Making unlawful and misleading "0 grams Trans Fat" claims and failing to utilize the mandatory disclosure statement required to inform consumers the products contained deleterious ingredients at levels deemed to pose a danger of diet related disease or condition;

B. Making unlawful and misleading "Evaporated Cane Juice" claims;

C. Making unlawful and misleading nutrient content claims and failing to meet the minimum nutritional requirements that are legally required for the nutrient content claims that are being made;

D. Making unlawful and misleading healthy and "Wholesome" claims;

E. Making unlawful and misleading fortified claims; and

F. Using unlawful and misleading "slack fill."

20. Defendants' products, referenced in paragraphs 51, 100, and 126, contain the identical unlawful label statements as the Purchased Products and therefore are identically unlawful and misleading. Whether products have the same identical unlawful statement is the most important consideration in determining whether or not a plaintiff has standing for products she did not purchase.

21. Defendants' practices are unlawful and mislead consumers and deprive them of the information required to make informed purchasing decisions.

22. Similarly, California and federal laws have placed numerous requirements on food companies that are designed to ensure that the claims that companies make about their products to consumers are truthful, accurate and backed by acceptable forms of scientific proof. When Defendants make false and unlawful nutrient content and health-related and other labeling claims that are prohibited by regulation, consumers such as Plaintiffs are misled.

23. Identical California and federal laws regulate the content of labels on packaged food. The requirements of the federal FDCA were adopted by the California legislature in the Sherman Law. Under both the Sherman Law and FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or its labeling. Cal. Health & Safety Law 110660; 21 U.S.C. § 343(a).

24.     Under the FDCA, the term "false" has its usual meaning of "untruthful," while the term "misleading" is a term of art.  Misbranding reaches not only false claims, but also those claims that might be technically true, but which are still misleading.  If any representation in the labeling is misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

25.     In promoting the nutritional and health benefits of its Purchased Products and the Class Products, Defendants claim to understand the importance of communicating responsibly about their products.  Nevertheless, Defendants have knowingly made, and continue to make, false and deceptive claims about their Purchased Products and the Class Products in violation of identical federal and California laws that govern the types of representations that can be made on food labels.

26.     Defendants have also made, and continue to make, unlawful claims on food labels of their Purchased Products and the Class Products that are prohibited by federal and California law and which render these products misbranded. Under federal and California law, Defendants' Purchased Products and the Class Products cannot legally be manufactured, advertised, distributed, held or sold.  Defendants' conduct of misbranding its product is actionable irrespective of any reliance, or not, by product purchasers like Plaintiffs. (See ¶ 6 *supra*).

27.     Defendants also have made, and continue to make unlawful claims prohibited by federal and California law on their websites, which are considered to be product food labeling for the Purchased Products and the Class Products. These unlawful claims are labeling and render these products misbranded under the unlawful prong of the UCL. As stated above, these website claims make the product misbranded without any allegations of reliance by or deception of the Plaintiff. The website claims are illegal *as a matter of law*.

28.     Defendants' violations of law are their illegal labeling practices which misbrand their products and the illegal advertising, marketing, distribution, delivery and sale of Defendants' misbranded Purchased Products and the Class Products to consumers in California and throughout the United States.

**PARTIES**

29.     Plaintiff Sarah Samet is a resident of San Jose, California who purchased the following: Pringles Original snack chips (6.41 oz. cylinder) (Exhibit 1); Pringles 18 Variety Pack (original, cheddar cheese and sour cream and onion .74 oz tubs) (Exhibit 2); and Pringles 8 Pack (sour cream and onion .74 oz tubs) (Exhibit 3) in California during the Class Period.  Plaintiff Samet purchased more than $25.00 of Pringles snack chips during the Class Period.  Exhibits 1-3 are copies of photographs of product labels on the products purchased by Plaintiff Sarah Samet.

30.     Plaintiff Jay Peters is a resident of San Jose who also purchased the same Pringles Original snack chips (6.41 oz. cylinder) as Plaintiff Samet. Plaintiff Peters also purchased the following: Kellogg's MorningStar Farms BBQ Riblets (10oz.) (Exhibit 4); and Kellogg's Fruity Snacks (Mixed Berry 8 oz. box) (Exhibit 5) in California during the Class Period.  Exhibits 4-5 are copies of photographs of product labels on the products purchased by Plaintiff Jay Peters. Plaintiff Peters purchased more than $25.00 of these products during the Class Period.

31.     Exhibits 1 through 5 are true, correct and accurate copies and depictions of those product labels as labeled by Defendants.

32.     Defendant Procter & Gamble Company is an Ohio company with its principal place of business in Cincinnati, Ohio.

33.     Defendant Kellogg Company is a Delaware corporation with its principal place of business in Michigan.

**JURISDICTION AND VENUE**

34.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which:  (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different citizenship from Defendants; and (3) the claims of the proposed class members exceed $5,000,000 in the aggregate.

35.     Alternatively, the Court has jurisdiction over all claims alleged herein pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

36.     The Court has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged in this Second Amended Complaint occurred in California, Defendants

1   are authorized to do business in California, Defendants have sufficient minimum contacts with

2   California, and Defendants otherwise intentionally avail themselves of the markets in California

3   through the promotion, marketing and sale of merchandise, sufficient to render the exercise of

4   jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5       37.     Because a substantial part of the events or omissions giving rise to these claims

6   occurred in this District and because the Court has personal jurisdiction over Defendants, venue is

7   proper in this Court pursuant to 28 U.S.C. § 1391(a) and (b).

8                          **FACTUAL ALLEGATIONS**

9       **A.    Identical California and Federal Laws Regulate Food Labeling**

10      38.     Food manufacturers are required to comply with identical federal and state laws

11  and regulations that govern the labeling of food products.  First and foremost among these is the

12  FDCA and its labeling regulations, including those set forth in 21 C.F.R. § 101.

13      39.     Pursuant to the Sherman Law, California has expressly adopted the federal

14  labeling requirements as its own and indicated that "[a]ll food labeling regulations and any

15  amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993,

16  or adopted on or after that date shall be the food regulations of this state."  California Health &

17  Safety Code § 110100.

18      40.     In addition to its blanket adoption of federal labeling requirements, California has

19  also enacted a number of laws and regulations that adopt and incorporate specific enumerated

20  federal food laws and regulations.  These specific regulations include, *inter alia*, that food

21  products: (i) are misbranded under California Health & Safety Code § 110660 if their labeling is

22  false and misleading in one or more particulars; (ii) are misbranded under California Health &

23  Safety Code § 110665 if their labeling fails to conform to the requirements for nutrient labeling

24  set forth in 21 U.S.C. § 343(q) and regulations adopted thereto; (iii) are misbranded under

25  California Health & Safety Code § 110670 if their labeling fails to conform with the requirements

26  for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and regulations adopted

27  thereto; (iv) are misbranded under California Health & Safety Code § 110705 if words,

28  statements and other information required by the Sherman Law to appear on their labeling are

either missing or not sufficiently conspicuous; (v) are misbranded under California Health & Safety Code § 110725 if they list any ingredient by something other than the ingredient's common or usual name; (vi) are misbranded under California Health & Safety Code § 110735 if they are represented as having special dietary uses but fail to bear labeling that adequately informs consumers of their value for that use; and (vii) are misbranded under California Health & Safety Code § 110740 if they contain artificial flavoring, artificial coloring and chemical preservatives but fail to adequately disclose that fact on their labeling.

## B. FDA Enforcement History

41.     In recent years the FDA has become increasingly concerned that food manufacturers have been disregarding food labeling regulations. To address this concern, the FDA informed the food industry of its concerns and placed the industry on notice that food labeling compliance was an area of enforcement priority.

42.     In October 2009, the FDA issued its *2009 Guidance for Industry: Letter Regarding Point of Purchase Food Labeling* ("2009 FOP Guidance") to the food industry that stated in relevant part:

-   "It is …essential that both the criteria and symbols used in front-of-package and shelf-labeling systems be nutritionally sound, well-designed to help consumers make informed and healthy food choices, and not be false or misleading;"

-   "FOP and shelf labeling that is used in a manner that is false or misleading misbrands the products it accompanies. Similarly, a food that bears FOP or shelf labeling with a nutrient content claim that does not comply with the regulatory criteria for the claim as defined in Title 21 Code of Federal Regulations (CFR) 101.13 and Subpart D of Part 101 is misbranded;" and

-   Food information is material to consumers, and the FDA intends to enforce regulations where the labeling statements are "not consistent with current nutrient claim requirements."

43.     A true and correct copy of the 2009 FOP Guidance is attached hereto as Exhibit 6.

44.     Defendants had actual knowledge of the 2009 FOP Guidance.

45.     After learning of the 2009 FOP Guidance, Defendants did not remove the (i) unlawful and (ii) misleading labels from its Purchased Products or the Class Products.

46.     On March 3, 2010, the FDA issued an "*Open Letter to Industry from [FDA Commissioner] Dr. Hamburg*" ("Open Letter"). The Open Letter reiterated the FDA's concern regarding false and misleading labeling by food manufacturers.  In pertinent part, the letter provided:

-       Nutrition information on labeling is material to consumers because of the prevalence of obesity and diet-related diseases, and those labels must be reliable;

-       Given that materiality, the FDA seeks to improve the accuracy of labeling, specifically including the "front-of-pack" labeling, such that mothers and other citizens are able to make educated choices; and

-       The FDA continues to see food manufacturers mislabel their products and give false and misleading statements that inhibit the ability of consumers to make good choices. The FDA expressed those concerns in a "Dear Industry" letter, notifying manufacturers to: bring their products into compliance; allow customers to make informed decisions; differentiate labels for products aimed at adults versus children; ensure that "trans fat" representations are accurate and not disqualified by high fat content or other factors; and avoid misleading "healthy" claims.

47.     Defendants have continued to mislabel their Purchased Products and the Class Products after learning of the Open Letter.

48.     A true and correct copy of that *Open Letter to Industry from [FDA Commissioner] Dr. Hamburg* is attached hereto as Exhibit 7.

## SHERMAN LAW VIOLATIONS

**A.     Defendants Make Unlawful "0g Trans Fat" Claims**

49.     As to their unlawful claim, Plaintiffs allege pursuant to Federal Rule of Civil Procedure 8 as follows:

50.     During the class period identified herein, Plaintiffs Samet and Peters each purchased Defendants' Pringles snack chips labeled with the unlawful statement "0g Trans Fat." The Pringle products purchased by Plaintiffs all fail to bear the mandatory disclosure statement required to inform consumers that the products contained deleterious ingredients at levels deemed by regulators to pose a risk of a "diet related" "disease or health condition."

51.     Defendants also manufactured and sold other Pringles potato snack products which contain the same identical  "0g Trans Fat" label statement, including the following Pringles snack

chips: Pringles BBQ, Pringles Honey Mustard, Pringles Jalapeño,  Pringles Loaded Baked Potato, Pringles Ranch, Pringles Salt and Vinegar, Pringles Reduced Fat Original, Pringles Reduced Fat Sour Cream and Onion, Pringles Cheez Ummms, Pringles Cheez Ummms with Jalapeño Cheddar,  Pringles Cheez Umms Cheddar and Sour Cream, Pringles Lightly Salted Original, Pringles Original 100 Calorie Packs, and Pringles Sour Cream and Onion 100 Calorie Packs. None of these products bore the mandatory disclosure statement required to inform consumers that the products contained deleterious ingredients at levels deemed by regulators to pose a risk of a "diet related" "disease or health condition."

52.     All of these products are labeled with the same identical unlawful and misleading statement "0 grams Trans Fat" and all omit the required disclosure statement. Exhibit 8 is a compilation of the labels of the above referenced substantially similar products which contain the same or similar "0g Trans Fat" label statement as the Pringles snack chips Plaintiffs purchased and which omit the required disclosure statement.

53.     The labels in Exhibit 8 are true, correct and accurate copies of those labels.

54.     The unlawful and misleading "0g Trans Fat" label statement appears on the labels of all of Defendants' Pringles snack chips Class Products listed in paragraph 51 and all of these products omit the mandatory disclosure statement.

55.     Plaintiffs reasonably relied on the fact that Pringles snack chips were not misbranded under the Sherman Law and were therefore legal to buy and possess. Plaintiffs would not have purchased Pringle snack chips had they known they were illegal to purchase and possess the products.

56.     To appeal to consumer preferences, Defendants repeatedly made improper nutrient content claims on the Purchased Products and the Class Products listed in paragraph 51 by using the "0 grams Trans Fat" statement which contained disqualifying levels of fat, saturated fat, cholesterol or sodium.  These nutrient content claims were improper because Defendants failed to include disclosure statements required by law that are designed to inform consumers of the inherently unhealthy aspects of those products in violation of 21 C.F.R. § 101.13(h), which has been incorporated in California's Sherman Law.

57. Defendants' unlawful statements on products of "0g Trans Fat" result in two separate and independent unlawful violations, bringing into effect four separate law violations: one a specific labeling violation and one a violation for the sale of a misbranded product. When a manufacturer such as the Defendant makes an unlawful 0 g Trans Fat nutrient content claim it violates 21 CFR § 101.13 (and Sherman Law § 110100), Sherman Law § 110670 and Sherman Law § 110705. Thus, it violates the unlawful prong. Such products are misbranded under Sherman Law § 110660, Sherman Law § 110670 and Sherman Law § 110705. Defendants' act of selling a misbranded product violates Sherman Law § 110760.

58. The sale of a misbranded product results in an independent violation of the unlawful prong that is separate from the labeling violation. (*See* ¶6 supra). The only necessary element of that claim is Defendants' unlawful label, and injury arises from the unlawful sale of an illegal product that is unlawful to sell and unlawful to possess. No reliance by the consumer is necessary. Plaintiffs have been deprived of money in an illegal sale and given a worthless illegal product in return. In addition, due to the law's prohibition of possession of such a product, Plaintiffs have been unwittingly placed by the Defendants' conduct in a legal position that no reasonable consumer would agree to be placed.

59. 21 C.F.R. § 101.13 (h)(l) provides that:

> If a food … contains more than 13.0 g of fat, 4.0 g of saturated fat, 60 milligrams (mg) of cholesterol, or 480 mg of sodium per reference amount customarily consumed, per labeled serving, or, for a food with a reference amount customarily consumed of 30 g or less … per 50 g … then that food must bear a statement disclosing that the nutrient exceeding the specified level is present in the food as follows: "See nutrition information for __ content" with the blank filled in with the identity of the nutrient exceeding the specified level, e.g., "See nutrition information for fat content."

60. 21 C.F.R. § 1.21 establishes that failure to disclose material facts is a violation of the disclosure rules and is *per se* "misleading." The fat which Defendants failed to disclose is material.

61. Defendants repeatedly violated these provisions when they prominently stated "0g Trans Fat" claim on their label without the mandatory disclosure statement.

62.    The "0g Trans Fat" claim on these products contain disqualifying levels of fat exceed the 13 gram disclosure threshold.

63.    Pursuant to 21 C.F.R. § 101.13(h), Defendants are prohibited from making the unqualified nutrient claims of "0 grams Trans Fat" or "No Trans Fat" claim on its food products if their products contain fat in excess of 13 grams, saturated fat in excess of 4 grams, cholesterol in excess of 60 milligrams, or sodium in excess of 480mg per 50 grams, unless the product also displays a disclosure statement that informs consumers of the product's fat, saturated fat and sodium levels.

64.    These regulations are intended to ensure that consumers are not misled into the erroneous belief that a product that claims, for instance, to be low in trans fat, but actually has other unhealthy fat levels, is a healthy or healthier choice, because of the lack of trans fats.

65.    Nevertheless, Defendants' products' label stated that their product contained "0g Trans Fat" without such a disclosure even though all the Pringles snack products in the Class, and listed in paragraph 51, contain fat in excess of 13 grams.

66.    Based on the fat content in Defendants' Pringles snack chips and the identically labeled products identified in paragraph 51, pursuant to federal and California law, Defendants must include a warning statement adjacent to the trans fat nutrient claim that informs consumers of the high levels of fat.  No such disclosure statement was on these products. Therefore, Defendants' Pringle snack chips and all the identically labeled products reflecting the "0 grams Trans Fat" claim identified in paragraph 51 (labels depicted in Exhibit 8) are misbranded as a matter of federal and California law and cannot be sold. Accordingly, they have no economic value and are legally worthless.

67.    In October 2009, the FDA issued its FOP Guidance, to address its concerns about front of package labels. Despite the issuance of the 2009 FOP Guidance, Defendants did not remove the improper and misleading "0g Trans Fat" nutrient content claims from its Pringle snack chips and the similarly labeled products identified in paragraph 51.

68.    Notwithstanding the Open Letter (Exhibit 7), Defendants continued to use this improper trans fat nutrient content claim, despite the express guidance of the FDA in the Open

Letter that "claims that a product is free of trans fats, which imply that the product is a better choice than products without the claim, can be misleading when a product is high in saturated fat [or sodium, cholesterol or total fat], and especially so when the claim is not accompanied by the required statement referring consumers to the more complete information on the Nutrition Facts panel." *Id.*

69.     Defendants also ignored the FDA's Guidance for Industry, A Food Labeling Guide, which detailed the FDA's guidance on how to make nutrient content claims about food products that contain "one or more nutrients [like total fat at levels] in the food that may increase the risk of disease or health related condition that is diet related." Defendants utilized improper trans fat nutrient claims on the labels of its Defendants' Pringles snack chips and identically labeled products identified in paragraph 51. As such, these products ran afoul of FDA guidance as well as California and federal law.

70.     In addition to its guidance to industry, the FDA has sent warning letters to the industry, including many of Defendants' peer food manufacturers, for the same identical types of improper "0 grams Trans Fat" and "No Trans Fat" nutrient content claims described above. In these letters the FDA indicated that as a result of the same identical type of 0 gram trans fat claims utilized by Defendants, products were in "violation of the Federal Food, Drug, and Cosmetic Act … and the applicable regulations in Title 21, Code of Federal Regulations, Part 101 (21 CFR 101)" and "misbranded within the meaning of section 403 because the product label bears a nutrient content claim but does not meet the requirements to make the claim."

71.     The warning letters were hardly isolated, as the FDA has issued at least nine other warning letters to other companies for the same identical type of improper "0g Trans Fat" nutrient content claims at issue in this case.

72.     This Court has found this exact kind of label representation to be misleading.

73.      "A disqualifying level of, say, saturated fat is four grams per 'reference amount customarily consumed.'" 21 C.F.R. § 101.13(h)(1); *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111 (N.D. Cal. 2010).

74.     If this level is exceeded, a food purveyor is prohibited from making an unqualified claim touting the health benefits of another nutrient in the food.  *Id.*

75.     This is because the Agency has reasoned that the beneficent claim, standing alone, would be misleading."  *Id.*

76.     This Court has already held that a disqualifying claim such as Defendants' "0 grams Trans Fat," even if accurate, may be unlawful and misleading. *Wilson v. Frito-Lay North America, Inc*., 2013 WL 1320468 (N.D. April 1, 2013)(Plaintiffs sufficiently alleged claim that the "0 Grams Trans Fat" statement on bags of potato chips was deceptive because, accompanied by a disclosure of at least one of the ingredients that 21 C.F.R. § 101.13(h)(1) requires to be disclosed, they and other reasonable consumers would think that the statements on the labels make accurate claims about the labeled products' nutritional content when, in fact, they do not; disqualifying claim such as; "0 grams Trans Fat," even if accurate, may be unlawful and misleading).

77.     In *Chacanaca*, Judge Seeborg explained:

> The federal regulatory statute provides for this precise scenario: that is, it categorizes as misleading and therefore prohibited even true nutrient content claims if the presence of another "disqualifying" nutrient exceeds and amount established by regulation. The Agency has by regulation imposed "disqualifying" levels for only four nutrients: total fat, saturated fat, cholesterol, and sodium. 21C.F.R. §§ 101.13(h)(1), 101.14(a)(4). It is important to note how disqualifying claims work. A disqualifying level of say, saturated fat is four grams per "reference amount customarily consumed." 21C.F.R. § 101.13 (h)(1). If this level is exceeded, a food purveyor is prohibited from making an unqualified claim touting the health benefits of another nutrient in the food. This is because the Agency has reasoned that the beneficent claim, standing alone, would be misleading.

*Chacanaca*, 752 F. Supp. 2d at 1122 (emphasis in original).

78.     Despite the FDA's numerous warnings to industry, Defendants continued to sell Pringles snack chips and the Class Products identified in paragraph 51 bearing improper "0g Trans Fat" nutrient content claims without meeting the requirements to make this claim.

79.     Due to Defendants misbranding of the Pringles snack chips, Plaintiffs lost money by purchasing unlawful products.

80.     Thus, in this case, where Defendants unlawfully sold products containing an unlawful 0 g Trans Fat statement and omitting the mandatory disclosure statement, there is: 1) a violation of specific labeling regulations; 2) a violation the UCL's misleading prong due to Plaintiffs' reliance; and 3) an independent violation of the UCL's unlawful prong due to Defendants' sale of an illegal product that is unlawful to possess.

**B.      Defendant's Make Misleading "0g Trans Fat" Claims**

81.     As to their misleading claim, Plaintiffs allege pursuant to Federal Rule of Civil Procedure 9(b) as follows:

82.     Plaintiffs did not know, and had no reason to know, that Defendants' Pringles snack chips were misbranded, by the "0g Trans Fat" nutrient claims despite failing to meet the requirements to make those nutrient claims. Plaintiffs read and relied upon Defendants' front of package "0g Trans Fat" statement, and Plaintiffs were thus deceived.  Plaintiffs were further unaware that Defendants' Pringles snack chips contained total fat at levels in the food that, according to the FDA, "may increase the risk of disease or health related condition that is diet related."  Because of Defendants' unlawful and misleading "0g Trans Fat" claim and omitted disclosure statement, Plaintiffs were misled to believe that the product only made positive contributions to their diet by containing no appreciable levels of trans fats. Plaintiffs were misled to believe the products did not contain fat, cholesterol, sodium, and other negative food attributes at levels that may increase the risk of disease or health related conditions. Defendants' "0g Trans Fat" label claim and omitted disclosure statement led Plaintiffs to believe that Pringles were a better and healthier choice than other potato snack products.

83.     Defendants' conduct misled Plaintiffs because, with Defendants failing to disclose the high fat and other deleterious attributes of its food, Plaintiffs were misled into believing Defendants' product to be a healthy choice. Plaintiffs are conscious of the healthiness of the products they purchase, and Defendants' unlawful statements and omitted mandatory disclosures deprived Plaintiffs of their ability to take into account those foods' contributions, or not, to Plaintiffs' total dietary composition. Defendants' concealed the deleterious attributes of their food, and Plaintiffs were misled and deceived, both by Defendants' statements of the healthy

1    attribute ("0g Trans Fat") and failure to disclose the deleterious food attributes (fat content over

2    13g). These health conscious Plaintiffs were misled by the Defendants' unlawfully prominent

3    display of the ostensible good traits of its product, and unlawful failure to disclose the bad.

4         84.    Plaintiffs reasonably relied on this label representation when making their

5    purchase decision and were misled by the "0g Trans Fat" representation as described below.

6    Plaintiffs would not have purchased Pringles snack chips had they known the truth about these

7    products, i.e. that the products failed to only make positive contributions to Plaintiffs' diet and

8    that the products contain one or more nutrients like total fat at levels in the food that increased the

9    risk of disease and/or dietary health related conditions.  Plaintiffs had other food alternatives that

10   satisfied such standards and Plaintiffs also had cheaper alternatives.  Reasonable consumers

11   would have been misled in the same identical manner as Plaintiffs.

12        85.    Defendants' unlawful failure to use the mandatory disclosure is actionable.

13   Plaintiffs were unlawfully misled to believe that the products were low in fat, and heart and

14   overall healthy, etc... by the "0g Trans Fat" statement, and, as a result, they purchased these

15   products. Plaintiffs were misled and deceived through the very means and methods the FDA

16   sought to regulate.

17        86.     Plaintiffs and the Class would not have purchased Pringles snack chips and the

18   Class products identified in paragraph 51 had they not been misled by Defendants' unlawful "0

19   grams Trans Fat" claim and been properly informed by Defendants' of the deleterious attributes

20   of those products, and had they otherwise not have been improperly misled and deceived as stated

21   herein.

22        **C.     Defendants Make Unlawful Healthy Claims**

23        87.    As to their unlawful claim, Plaintiffs allege pursuant to Federal Rule of Civil

24   Procedure 8 as follows:

25        88.    Defendants have violated identical California and federal law by making

26   unapproved healthy claims about their products.

27        89.    The use of the term healthy is not a health claim but rather an implied nutrient

28   content claim about general nutrition that is defined by FDA regulation. In general, the term may

be used in labeling an individual food product that:

Qualifies as both low fat and low saturated fat;

Contains 480 mg or less of sodium per reference amount and per labeled serving, and per 50 g (as prepared for typically rehydrated foods) if the food has a reference amount of 30 g or 2 tbsps or less;

Does not exceed the disclosure level for cholesterol (e.g., for most individual food products, 60 mg or less per reference amount and per labeled serving size); and

Except for raw fruits and vegetables, certain frozen or canned fruits and vegetables, and enriched cereal-grain products that conform to a standard of identity, provides at least 10% of the daily value (DV) of vitamin A, vitamin C, calcium, iron, protein, or fiber per reference amount. Where eligibility is based on a nutrient that has been added to the food, such fortification must comply with FDA's fortification policy.

21 C.F.R. § 101.65(d)(2).

90.    The FDA's regulation of the use of the term healthy also encompasses uses of related terms (e.g., healthful, healthier) in food labeling. 21 C.F.R. § 101.65(d). This provision would include in its scope uses of a term like wholesome which is merely a synonym for healthy and is defined as "health giving: beneficial to physical health."

91.    Defendants have violated the provisions of 21 C.F.R. §101.65 by including certain healthy or "wholesome" claims on their Pringles snack chip labeling.

92.    Defendants stated on their websites that their Pringles snack chip products were made with "wholesome ingredients."

93.    In fact, the ingredients included fat and saturated fat at unhealthy levels and contained fat at a level deemed by the FDA as likely to pose a risk of a diet related disease or condition.

94.    Additionally, the ingredients in Pringles oil and dextrose are incapable of meeting the "healthy" standard and thus it is unlawful and deceptive and misleading to describe them as healthy or wholesome.  Pringles also contained unhealthy components like saturated fats and trans fats, which prevents Pringles from being labeled as "healthy" or "wholesome".

95.    Despite being aware of the criteria and restrictions that pertain to "healthy" claims, Defendants make unlawful "healthy" claims about their Pringles snack chips and their

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:12-cv-01891 (PSG)

20

1    components. Defendants indicate that these products and their ingredients are healthy or

2    "wholesome" or can be an important part of a healthier diet. Defendants do this in violation of 21

3    C.F.R. §101.65 which has been adopted by California and which precludes the use of these terms

4    about Defendants products such as the Misbranded Food Products purchased by Plaintiffs. Those

5    products contain disqualifying levels of unhealthy nutrients like fat and saturated fat and lack the

6    minimum nutritional requirements.

7         96.    It was unlawful to sell such misbranded products and the Plaintiffs would not have

8    bought these products had they known they were misbranded and illegal to sell or possess

9         **D.    Defendant Kellogg Makes Unlawful Evaporated Cane Juice Claims**

10        97.    As to their unlawful claims, Plaintiffs allege pursuant to Federal Rule of Civil

11   Procedure 8 as follows:

12        98.    As discussed herein, evaporated cane juice is an unlawful term because it is not the

13   common or usual name for the ingredient in question.

14        99.    Defendant Kellogg's unlawful product descriptions and ingredient listings on their

15   MorningStar Farms Hickory BBQ Riblets and identically and/or substantially similarly labeled

16   Class Products render the products misbranded under California law.  Misbranded products

17   cannot be legally sold and are legally worthless.

18        100.    During the Class Period, Plaintiff Jay Peters purchased Defendant Kellogg's

19   MorningStar Farm Hickory BBQ Riblets labeled with the unlawful statement "Evaporated Cane

20   Juice." The same identical unlawful "Evaporated Cane Juice" statement is shown on the

21   following MorningStar Farms Products: MorningStar Vegan Chik'n Strips, MorningStar Chik'n

22   Strips, MorningStar Grillers' Recipe Crumbles, MorningStar Three-Bean Chili with Grillers'

23   Crumbles, MorningStar Grillers' Turkey Burger, MorningStar Breakfast Patties, MorningStar

24   Farms Chik'n Enchilada, MorningStar Farms Sesame Chik'n, MorningStar Farms Sweet & Sour

25   Chik'n, and MorningStar Farms Steak Strips.

26        101.    Exhibit 9 is a compilation of the labels of the above referenced products which are

27   substantially similar and which contain the same identical unlawful "Evaporated Cane Juice"

28   statement.

SECOND AMENDED CLASS ACTION COMPLAINT                                          21
CASE NO. 5:12-cv-01891 (PSG)

102.    Exhibit 9 is a true, correct and accurate copy and depiction of those product labels as labeled by Defendant Kellogg.

103.    Defendant Kellogg also manufactured and sold other MorningStar Farms products which contain the same identical unlawful statement "Evaporated Cane Juice."

104.    21 C.F.R. §§ 101.3 and 102.5, which have been adopted by California, prohibit manufacturers from referring to foods by anything other than their common and usual names.

105.    21 C.F.R. § 101.4, which has been adopted by California, prohibits manufacturers from referring to ingredients by anything other than their common and usual names.

106.    Defendant Kellogg has violated these provisions by failing to use the common or usual name for ingredients mandated by law.  In particular, Defendant Kellogg used the unlawful term evaporated cane juice on it products in violation of numerous labeling regulations designed to protect consumers from misleading labeling practices.  Defendant Kellogg's practices also violated express FDA policies.

107.    In October of 2009, the FDA issued *Guidance for Industry: Ingredients Declared as Evaporated Cane Juice*, which advised industry and that:

> [T]he term "evaporated cane juice" has started to appear as an ingredient on food labels, most commonly to declare the presence of sweeteners derived from sugar cane syrup. However, FDA's current policy is that sweeteners derived from sugar cane syrup should not be declared as "evaporated cane juice" because that term falsely suggests that the sweeteners are juice…
>
> "Juice" is defined by 21 CFR 120.1(a) as "the aqueous liquid expressed or extracted from one or more fruits or vegetables, purees of the edible portions of one or more fruits or vegetables, or any concentrates of such liquid or puree." …
>
> As provided in 21 CFR 101.4(a)(1), "Ingredients required to be declared on the label or labeling of a food . . . shall be listed by common or usual name . . . ." The common or usual name for an ingredient is the name established by common usage or by regulation (21 CFR 102.5(d)). The common or usual name must accurately describe the basic nature of the food or its characterizing properties or ingredients, and may not be "confusingly similar to the name of any other food that is not reasonably encompassed within the same name" (21 CFR 102.5(a))…
>
> Sugar cane products with common or usual names defined by regulation are sugar (21 CFR 101.4(b)(20)) and cane sirup (alternatively spelled "syrup") (21 CFR 168.130). Other sugar cane products have common or usual names established by common usage (e.g., molasses, raw sugar, brown sugar, turbinado sugar,

muscovado sugar, and demerara sugar)…

The intent of this draft guidance is to advise the regulated industry of FDA's view that the term "evaporated cane juice" is not the common or usual name of any type of sweetener, including dried cane syrup. Because cane syrup has a standard of identity defined by regulation in 21 CFR 168.130, the common or usual name for the solid or dried form of cane syrup is "dried cane syrup."…

Sweeteners derived from sugar cane syrup should not be listed in the ingredient declaration by names which suggest that the ingredients are juice, such as "evaporated cane juice." FDA considers such representations to be false and misleading under section 403(a)(1) of the Act (21 U.S.C. 343(a)(1)) because they fail to reveal the basic nature of the food and its characterizing properties (i.e., that the ingredients are sugars or syrups) as required by 21 CFR 102.5. Furthermore, sweeteners derived from sugar cane syrup are not juice and should not be included in the percentage juice declaration on the labels of beverages that are represented to contain fruit or vegetable juice (see 21 CFR 101.30).

http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition/ucm181491.htm

108.    Despite the issuance of this 2009 FDA Guidance, Defendant Kellogg did not remove the unlawful food labeling ingredients from the Class Products.

109.    The Nutrition Facts label of the Purchased Products and the Class Products list "Evaporated Cane Juice" as an ingredient.  According to the FDA, "'evaporated cane juice' is not the common or usual name of any type of sweetener, including dried cane syrup" or sugar.  The FDA provides that "cane syrup has a standard of identity defined by regulation in 21 C.F.R. § 168.130, the common or usual name for the solid or dried form of cane syrup is 'dried cane syrup.'" Sugar also has a standard of identity and is defined in 21 C.F.R. §§ 101.4(b)(20) and 184.1854, which encompasses sucrose "obtained by crystallization from sugar cane or sugar beet juice that has been extracted by pressing or diffusion, than clarified and evaporated."

110.    Defendant Kellogg violated 21 CFR 101.4 (adopted and incorporated by reference by Sherman Law Section 110100) and Sherman Law Section 110725 (mandating common and usual ingredient names) and thus violated the unlawful prong.

111.    Any product of Kellogg's labeled with the term "evaporated cane juice" is misbranded under Sherman Law Section 110660 (false or misleading labeling misbrands product) and Sherman Law Section 110725 (failure to use common and usual ingredient names misbrand

1    product).

2         112.    Kellogg's act of selling a misbranded product violates Sherman Law Section

3    110760 (unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that

4    is misbranded). The sale of a misbranded product results in an independent violation of the

5    unlawful prong that is separate from the labeling violation. When Plaintiff Peters purchased a

6    misbranded product there is causation and injury even absent reliance on the

7    misrepresentation/omission that misbranded the product. This injury arises from the unlawful sale

8    of an illegal product that is crime to sell and crime to possess. Plaintiff Peters has been deprived

9    of money in an illegal sale and given a worthless illegal product in return. In addition, due to the

10   law's prohibition of possession of such a product, consumers have been unwittingly placed by

11   Kellogg's conduct in a legal position that no reasonable consumer would choose.

12        113.    Various FDA warning letters have made it clear that the use of the term evaporated

13   cane juice is unlawful because the term does not represent the common or usual name of a food or

14   ingredient. These warning letters indicate that foods that bear labels that contain the term

15   evaporated cane juice are misbranded. Such unlawful conduct by Defendant Kellogg is actionable

16   under California law irrespective of any reliance, or not, by product purchasers such as Plaintiff.

17   (See ¶ 6 *supra*).

18        **E.    Defendant Kellogg Makes Misleading Evaporated Cane Juice Claims**

19        114.    As to their misleading claim, Plaintiffs allege pursuant to Federal Rule of Civil

20   Procedure 9(b) as follows:

21        115.    Defendant Kellogg's unlawful label statements products mislead consumers into

22   paying a premium price for inferior or undesirable ingredients or for products that contain

23   ingredients not listed on the label.

24        116.    Defendant Kellogg's false, unlawful, and misleading ingredient listings render the

25   products misbranded under California law.  Misbranded products cannot be legally sold and are

26   legally worthless.  Plaintiffs and the class paid a premium price for the Misbranded Food

27   Products.

28        117.    Plaintiff Jay Peters bought Defendant Kellogg's MorningStar Farm Hickory BBQ

1  Riblets (Exhibit 4).

2       118.    Plaintiff Peters bought the MorningStar Farm Hickory BBQ Riblets because he

3  was misled by Defendant Kellogg's "Evaporated Cane Juice" statement into believing that

4  ingredient was other than what it actually is, "sugar" or "dried cane syrup." Plaintiff was also

5  misled and deceived into believing the ingredient to be "juice" rather than "sugar." Defendant

6  Kellogg's unlawful use of "Evaporated Cane Juice" improperly led Plaintiff Peters to believe that

7  the ingredient had redeeming health qualities, and was something other than "sugar." The amount

8  of "sugar" in a diet is material to reasonable consumers, since the quantity of that ingredient

9  affects numerous dietary health conditions (e.g., obesity, insulin sensitivity, blood pressure, heart

10  health, etc…), and can negatively impact one's health. Defendant Kellogg purposefully used the

11  unlawful and misleading term "Evaporated Cane Juice," instead of calling "sugars," "sugar," to

12  mislead Plaintiff Peters and other consumers to avoid being deterred by that product

13  characteristic. Plaintiff Peter was deceived by that misrepresentation into purchasing the

14  MorningStar Farm Hickory BBQ Riblets.

15       119.    Defendant Kellogg's use of the term evaporated cane juice falsely suggests that the

16  sweetener is juice, not sugar or syrup. Plaintiff Peters was deceived and misled by that statement.

17  Plaintiff Peters is health conscious and, because added sugars pose known risk to the public

18  health and cause dietary conditions, Plaintiff Peters attempts to be aware of and seeks to limit his

19  added sugar intake. Defendant Kellogg's misbranding deprived him of the knowledge to make a

20  choice to limit his added sugar. Defendant Kellogg's use of evaporated cane juice allowed it to

21  conceal the source of its sweetener, and concealed from Plaintiff that Defendant Kellogg was

22  simply adding sugar. Defendant Kellogg did such without informing Plaintiff Peters, as required

23  by law, that the added sugar was the second most prevalent ingredient by weight.

24       120.    Plaintiff Peters would not have brought Defendant Kellogg's MorningStar Farms

25  products absent Defendant Kellogg's misstatements about "Evaporated Cane Juice" and

26  Defendant Kellogg's concealment of the added sugar and relative amounts of added sugar in their

27  products. Plaintiff Peters also would not have paid the premium price for those products, and

28  Plaintiff Peters would not have purchased those products knowing they were illegal to sell or

1   possess because of the unlawful "Evaporated Cane Juice" statement. Defendants' use of the term

2   evaporated cane juice misled Plaintiff Peters because that term does not accurately describe the

3   basic nature of the food or its characterizing properties or ingredients, and it is "confusingly

4   similar to the name of any other food that is not reasonably encompassed within the same name;

5   in short, it concealed the sugar added to the project. Here the true nature of the ingredient is a type

6   of added sugar added to sweeten food. The characterizing properties of this ingredient were

7   falsely misrepresented as a juice when in fact they were a sugar or syrup. Kellogg hid this fact

8   from Plaintiff Peters by unlawfully using a confusing name (a type of juice) that is not reasonably

9   encompassed within the same name. In doing so Kellogg deceived Plaintiff Peters about the

10   presence of added sugars that Plaintiff Peters sought to avoid.

11         121.   Plaintiff Peters was also mislead  by the Defendants' use of the term evaporated

12   cane juice because that term  does not accurately describe the basic nature of the food or its

13   characterizing properties or ingredients, and may not be "confusingly similar to the name of any

14   other food that is not reasonably encompassed within the same name. The common or usual name

15   must accurately describe the basic nature of the food or its characterizing properties or

16   ingredients, and may not be "confusingly similar to the name of any other food that is not

17   reasonably encompassed within the same name" (21 CFR 102.5(a)). Here the true nature of the

18   ingredient is a type of added sugar added to sweeten food. The characterizing properties of this

19   ingredient were falsely misrepresented as a juice when in fact they were a sugar or syrup. Kellogg

20   hid this fact from the Plaintiff Peters by unlawfully using a confusing name (a type of juice) that

21   is not reasonably encompassed within the same name. In doing so Kellogg deceived Plaintiff

22   Peters about the presence of added sugars that Plaintiff Peters sought to avoid.

23         122.   Added sugars pose a known risk to public health. Thus, many people (such as

24   Plaintiff) seek to avoid added sugars. It is impossible to determine from the listing of total sugar

25   how much of the sugar in a product is added sugar. Lack of the term sugar in the ingredient list

26   misleads consumers like Plaintiff Peters to believe that the product has no added sugar and only

27   contains sugars naturally found in the core ingredients comprising the product. Added sugar can

28   only be identified from the ingredient list. For this, among other reasons, the FDA and the State

1    of California mandate that ingredient lists utilize the common and usual names for ingredients

2    and that sugar cane products be identified by the names mandated by the FDA.  Plaintiff Peters

3    would not have bought the Kellogg's products absent Kellogg's misrepresentations about

4    "evaporated cane juice" and Kellogg's concealment of the added sugar and relative amounts of

5    added sugar in their products labeled with the unlawful term evaporated cane juice.

6         123.    Plaintiff Peters was also misled by the Kellogg's implicit representation that its

7    products listing evaporated cane juice as an ingredient were legal to sell and possess. Had

8    Plaintiff Peters known that due to the products misbranding they were in fact illegal to sell or

9    possess pursuant to California Sherman Law section 110760, Plaintiff Peters would not have

10   purchased these products and parted with money for a product that was worthless and posed

11   possibly negative legal ramifications to  consumers. It should be noted that Plaintiff Peters was

12   injured by the Kellogg's sale of an illegal product and Kellogg's violation of the unlawful prong

13   of the UCL even absent any reliance on Kellogg's implicit representations about their misbranded

14   products, due to the Kellogg's mere sale of a product that was illegal to sell or possess and which

15   had no value as a matter of law.

16        F.    **Defendant Kellogg Makes Unlawful Claims That Its Fruity Snacks Are**
17              **Fortified**

18        124.    As to their unlawful claims, Plaintiffs allege pursuant to Federal Rule of Civil

19   Procedure 8 as follows:

20        125.    Defendant Kellogg improperly fortified its fruit snacks, such as the fruity snacks

21   purchased by Plaintiff Peters. Having illegally fortified its fruit snacks, Defendant Kellogg then

22   promoted its Kellogg's Fruity Snacks as being fortified with Vitamin C. Defendant Kellogg has

23   done so by placing the statement "100% DV Vitamin C" on its fruit snack products when this

24   Vitamin C was the merely the result of Kellogg's illegal fortification, a fact which Kellogg does

25   not disclose. Defendant Kellogg's "100% DV Vitamin C" fortification is in direct violation of the

26   express policy against fortifying snack foods like the fruit snacks contained in 21 C.F.R. §

27   104.20, which has been adopted in California.

28        126.    During the Class Period, Plaintiff Jay Peters purchased Defendant Kellogg's

1  unlawfully fortified Mixed Berry Fruity Snacks labeled with statement "100% DV Vitamin C."

2  The same identical "100% DV Vitamin C" statement is found on the following Kellogg fruit

3  snack products, all of which have been improperly fortified: Kellogg's Super Mario Fruit

4  Flavored Snacks, Kellogg's DreamWorks Turbo Racing Team Fruit Flavored Snacks, Kellogg's

5  Disney Fairies Fruit Flavored Snacks, Kellogg's Marvel Iron Man 3 Fruit Flavored Snacks,

6  Kellogg's Mickey Mouse and Friends Fruit Flavored Snacks, Kellogg's Finding Nemo Fruit

7  Flavored Snacks, Kellogg's Disney/Pixar Toy Story Fruit Flavored Snacks, Kellogg's

8  Disney/Pixar Monster University Fruit Flavored Snacks, Kellogg's Disney Jake and the

9  Neverland Pirate Fruit Flavored Snacks, Kellogg's Disney/Pixar Brave Fruit Flavored Snacks,

10  Kellogg's Disney/Pixar Cars Fruit Flavored Snacks, Kellogg's Disney Phineas and Ferb Fruit

11  Flavored Snacks, and Kellogg's Ice Age Fruit Flavored Snacks.

12       127.    Exhibit 10 is a compilation of the labels of the above referenced products, all of

13  which have been improperly fortified, and all of which are substantially similar and contain the

14  same identical "100% DV Vitamin C" statement.

15       128.    Exhibit 10 is a true, correct and accurate copy and depiction of those product

16  labels as labeled by Defendant Kellogg.

17       129.    Defendant Kellogg also promoted its Kellogg's Fruity Snacks on its website,

18  http://www.kelloggs.com/en_US/kelloggs-fruity-snacks-mixed-berry-fruit-flavored-snacks.html,

19  (a copy of which is attached hereto as Exhibit 11) as being fortified with Vitamin C but such

20  fortification was unlawful and in violation of the policy against fortifying snack foods like the

21  fruit snacks in 21 C.F.R. §104.20, which has been adopted by California.

22       130.    A true and correct copy of that website page is attached hereto as Exhibit 11.

23       131.    Defendant Kellogg's actions were unlawful and caused Plaintiff Peters to lose

24  money by purchasing an unlawful product.

25       132.    Defendants' actions were also misleading because they misrepresented the

26  healthiness and nutritiousness of the junk food they fortified illegally by conveying the

27  impression that they made a positive contribution to diet.

28       133.    It was unlawful to sell such misbranded products and the Plaintiffs would not have

1    bought these products had they known they were misbranded and illegal to sell or possess

2        **G.    Defendants Have Violated California law by Using Misleading Containers**
3        **That Are Slack Filled**

4        134.    Pursuant to C.F.R. 100.100 which has been adopted by California:

5        In accordance with section 403(d) of the act, a food shall be deemed to be
6        misbranded if its container is so made, formed, or filled as to be misleading.

7        (a) A container that does not allow the consumer to fully view its contents shall be
         considered to be filled as to be misleading if it contains nonfunctional slack-fill.
8        Slack-fill is the difference between the actual capacity of a container and the
         volume of product contained therein. Nonfunctional slack-fill is the empty space in
9        a package that is filled to less than its capacity for reasons other than:

10       (1) Protection of the contents of the package;
         (2) The requirements of the machines used for enclosing the contents in such
11       package;
12       (3) Unavoidable product settling during shipping and handling;
         (4) The need for the package to perform a specific function (e.g., where packaging
13       plays a role in the preparation or consumption of a food), where such function is
         inherent to the nature of the food and is clearly communicated to consumers;
14       (5) The fact that the product consists of a food packaged in a reusable container
         where the container is part of the presentation of the food and has value which is
15       both significant in proportion to the value of the product and independent of its
16       function to hold the food, e.g., a gift product consisting of a food or foods combined
         with a container that is intended for further use after the food is consumed; or
17       durable commemorative or promotional packages; or
         (6) Inability to increase level of fill or to further reduce the size of the package (e.g.,
18       where some minimum package size is necessary to accommodate required food
         labeling (excluding any vignettes or other non-mandatory designs or label
19       information), discourage pilfering, facilitate handling, or accommodate tamper-
20       resistant devices).

21       135.    Defendants routinely employed slack filled packaging to mislead consumers into

22   believing they were receiving more than they actually were.

23       136.    Defendants lacked any lawful justification for doing so.

24       137.    Plaintiffs and members of the Class relied on and were deceived by Defendants'

25   misleading slack filled packaging.

26       138.    Plaintiffs purchased slack filled packages of Defendants' Fruity Snacks and

27   Pringles.

28       139.    Plaintiffs did not know, and had no reason to know, that Defendants' Misbranded

Food Products were slack filled and misbranded. Had Plaintiffs known Defendants' packaging was slack filled they would not have bought the slack filled products. Plaintiffs and members of the Class who purchased the Misbranded Food Products paid an unwarranted premium for these products. Because of Defendants' slack fill packaging violations these products were misbranded and could not be legally held or sold. They were worthless.  It was also unlawful to sell such misbranded products and the Plaintiffs would not have bought these products had they known they were misbranded and illegal to sell or possess

**H.    Defendants' Website Claims of "Healthy," "Wholesome" and Fortification Render the Referenced Products Unlawful**

140.    Both federal and California law and the FDA both consider websites to be part of a label.  The Food, Drug and Cosmetic Act defines a label as "a display of written, printed, or graphic matter upon the immediate container of any article…" 21 U.S.C. § 321(k).  Labeling is defined under the Act as "all labels and other written, printed or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).  FDA guidance states: "if a label for a product contained a statement that referred the consumer to a specific website for additional information about a claim for a product, the website is likely to be 'labeling.'"

http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm053425.htm (a true and correct copy is attached as Exhibit 12).

141.    In addition to this guidance, the FDA has also repeatedly issued warning letters indicating websites — without specific reference to a product claim — are labeling under 21 U.S.C § 321(m).  In a warning letter to Unilever, Inc., the FDA stated:

> A link to your website, www.lipton.com appears on your … product label. This website directs U.S. visitors to another website, www.liptont.com. **We have determined that your websites, www.lipton.com and www.lipton.com are labeling within the meaning of section 201(m) of the Act** for your … product.

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2010/ucm224509.htm (a true and correct copy is attached as Exhibit 13).

Also, in a warning letter to Ocean Spray Cranberries, Inc., the FDA explained:

The Food and Drug Administration (FDA) reviewed your firm's internet labeling for your Ocean Spray juice products. The container label for your grapefruit juice products directs the consumer to your website via the statement "For grapefruit health facts visit: www.oceanspraygrapefruit.com." **The container labels for your other Ocean Spray juice products also bear your internet website address "www.oceanspray.com." We have concluded that the labeling found on your internet sites causes your Ocean Spray juice products to be in violation of the Federal Food, Drug, and Cosmetic Act [the Act], and Title 21, Code of Federal Regulations [21 CFR]**.

http://www.fda.gov/downloads/ICECI/EnforcementActions/WarningLetters/2001/UCM069236.pdf (emphasis added)(a true and correct copy is attached as Exhibit 14). By placing their website address, http://www.pringles.com, on their Pringles snack chips, Defendants invite and encourage consumers to look at the nutritional facts and health claims made on the website, which supports the unlawful claims made both on the product labels and on the website itself. The website, as part of product labeling, misbrands the products on whose labels the website is referenced and as misbranding products, these products become illegal to sell or possess. It was unlawful to sell such misbranded products and the Plaintiffs would not have bought these products had they known they were misbranded and illegal to sell or possess.

## DEFENDANTS HAVE VIOLATED CALIFORNIA LAW

142.    Defendants have violated California Health & Safety Code § 110390 which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product.

143.    Defendants have violated California Health & Safety Code § 110395 which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely advertised food.

144.    Defendants have violated California Health & Safety Code §§ 110398 and 110400 which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely advertised.

145.    Defendants have violated California Health & Safety Code § 110403 which makes it unlawful to advertise misbranded food by representing it to have any effect on conditions, disorders or diseases.

1      146.    Defendants have violated California Health & Safety Code § 110660 because its

2  Purchased Product labels are false and misleading in one or more ways.

3      147.    Defendants' Purchased Products and Class Products are misbranded under

4  California Health & Safety Code § 110665 because their labeling fails to conform to the

5  requirements for nutrient labeling set forth in 21 U.S.C. § 343(q) and the regulations adopted

6  thereto.

7      148.    Defendants' Purchased Products and Class Products are misbranded under

8  California Health & Safety Code § 110670 because their labeling fails to conform with the

9  requirements for nutrient content and health claims set forth in 21 U.S.C. § 343(r) and the

10  regulations adopted thereto.

11      149.    Defendants' Purchased Products and Class Products are misbranded under

12  California Health & Safety Code § 110705 because words, statements and other information

13  required by the Sherman Law to appear on their labeling either are missing or not sufficiently

14  conspicuous.

15      150.    Defendants' Purchased Products and Class Products are misbranded under

16  California Health & Safety Code § 110725 because they fail to use the common or usual name for

17  ingredients.

18      151.    Defendants' Purchased Products and Class Products are misbranded under

19  California Health & Safety Code § 110735 as they purport to be for special dietary uses, but do

20  not bear information concerning any vitamin or mineral content or other dietary property as

21  necessary to inform purchasers as to the food's value for that use.

22      152.    Defendants have violated California Health & Safety Code § 110760 which makes

23  it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is

24  misbranded.

25      153.    Defendants' Purchased Products and Class Products are misbranded under

26  California Health & Safety Code § 110755 because they purport to be or are represented for

27  special dietary uses, and its labels fail to bear such information concerning their vitamin, mineral,

28

1    and other dietary properties as the Secretary determines to be, and by regulations prescribes as,

2    necessary in order fully to inform purchasers as to its value for such uses.

3        154.    Defendants' Purchased Products and Class Products are misbranded under

4    California Health & Safety Code § 110740 because they contain artificial flavoring, artificial

5    coloring and chemical preservatives but fail to adequately disclose that fact on their labeling.

6        155.    Defendants have violated California Health & Safety Code § 110765 which makes

7    it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is

8    misbranded.

9        156.    Defendants have violated California Health & Safety Code § 110765 which makes

10   it unlawful for any person to misbrand any food.

11       157.    Defendants have violated California Health & Safety Code § 110770 which makes

12   it unlawful for any person to receive in commerce any food that is misbranded or to deliver or

13   proffer for deliver any such food.

14   **PLAINTIFFS PURCHASED DEFENDANTS' PRODUCTS WITH UNLAWFUL AND
     MISLEADING LABELS**

15
16       158.    Plaintiffs care about the nutritional content of food and seek to maintain a healthy

17   diet.

18       159.    Plaintiffs purchased Defendants' Purchased Products as described above on

19   numerous occasions during the Class Period. Because of Defendants' unlawful conduct, those

20   products were unlawful to sell, and should not have been on the store shelves. As such, the labels

21   are unlawful, and Defendants' conduct actionable. (See ¶ 6 *supra*).

22       160.    Plaintiffs read the particular label statements identified above on Defendants'

23   Purchased Products before purchasing them.  Defendants' labels falsely conveyed to the Plaintiffs

24   the net impression that the Purchased Products they bought made only positive contributions to a

25   diet, and did not contain any nutrients at levels that raised the risk of diet-related disease or

26   health-related condition.

27       161.    Plaintiffs read the unlawful and misleading statements referenced above on the

28   labels of Defendants' Purchased Products before purchasing them.  If Plaintiffs had known that

1    the unlawful and misleading statements that they read on Defendants' labels misbranded the

2    Purchased Products rendering them unlawful to possess or sell Plaintiffs would not have

3    purchased such products.  In addition, Defendants' unlawful statements falsely conveyed to the

4    Plaintiffs the net impression that the Purchased Products they bought made only positive

5    contributions to a diet, and did not contain any nutrients at levels that raised the risk of diet-

6    related disease or health-related conditions.  Plaintiffs relied on Defendants' label statements

7    identified above and based and justified the decision to purchase Defendants' Purchased Products,

8    in substantial part, on Defendants' label statements identified above.

9         162.    At point of sale, Plaintiffs did not know, and had no reason to know, that

10   Defendants' Purchased Products were misbranded as set forth herein, and would not have bought

11   the products had they known the truth about them.

12        163.    At point of sale, Plaintiffs did not know, and had no reason to know, that claims on

13   the Purchased Products were improper and unauthorized as set forth herein, and would not have

14   bought the products absent the claims.

15        164.    At point of sale, Plaintiffs did not know and had no reason to know that

16   Defendants' Purchased Products were misbranded, or that Defendants' claims were improper and

17   unauthorized, and Plaintiffs would not have purchased those products at the premium price paid.

18        165.    As a result of Defendants' unlawful and misleading label statements contained on

19   the Purchased Products, Plaintiffs and thousands of others in California bought the Purchased

20   Products.  Defendants' label statements on the Purchased Products as alleged herein are false and

21   misleading and were material and were designed to increase sales of the Purchased Products.  A

22   reasonable person would attach importance to Defendants' label statements as described herein in

23   determining whether to purchase the Purchased Products.

24        166.    A reasonable person would also attach importance to whether Defendants'

25   products were legally salable, and capable of legal possession, and to Defendants' representations

26   about these issues in determining whether to purchase the Purchased Products. Plaintiffs would

27   not have purchased Defendants' Purchased Products had they known they were not capable of

28   being legally sold or held.

SECOND AMENDED CLASS ACTION COMPLAINT                                    34
CASE NO. 5:12-CV-01891 (PSG)

1

**CLASS ACTION ALLEGATIONS**

2      167.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Procedure

3  23(b)(2) and 23(b)(3) on behalf of the following "Class:"

4      All persons in California who, within the Class Period, purchased one or more of

5  the following products:

6
   - Pringles Snack Chips labeled with the statement "0 grams Trans Fat" and
7      other products labeled with this identical statement;

8    - Kellogg's MorningStar Farm Hickory BBQ Riblets labeled with the
       statement "Evaporated Cane Juice" and other products labeled with this
9      identical statement; or

10   - Kellogg's Fruity snacks labeled with the statement "100% DV Vitamin C"
        and other products that are identically mislabeled.

11

12     168.    The following persons are expressly excluded from the Class:  (1) Defendants and

13  their subsidiaries and affiliates; (2) all persons who make a timely election to be excluded from

     the proposed Class; (3) governmental entities; and (4) the Court to which this case is assigned and
14
    its staff.
15
       169.    This action can be maintained as a class action because there is a well-defined
16
    community of interest in the litigation and the proposed Class is easily ascertainable.
17
       170.    Numerosity:  Based upon Defendants' publicly available sales data with respect to
18
    the misbranded products at issue, it is estimated that the Class numbers in the thousands, and that
19
    joinder of all Class members is impracticable.
20
       171.    Common Questions Predominate:  This action involves common questions of law
21
    and fact applicable to each Class member that predominate over questions that affect only
22
    individual Class members.  Thus, proof of a common set of facts will establish the right of each
23
    Class member to recover.  Questions of law and fact common to each Class member include, for
24
    example:
25

26          a.      Whether Defendants engaged in unlawful, unfair or deceptive
                    business practices by failing to properly package and label its
27                  Purchased Products sold to consumers;

28          b.      Whether the Purchased Products were misbranded as a matter of
                    law;

c.  Whether Defendants made improper and misleading nutrient contentand health claims;

d.  Whether Defendants made unlawful and misleading "Evaporated Cane Juice" or "Healthy" or "Wholesome" or Fortified claims;

f.  Whether Defendants violated California Bus. & Prof. Code § 17200 *et seq.*, California Bus. & Prof. Code § 17500 *et seq.*, the Consumers Legal Remedies Act, Cal. Civ. Code §1750 *et seq.*, and the Sherman Law;

g.  Whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief; and

h.  Whether Defendants' unlawful, unfair and/or deceptive practices harmed Plaintiffs and the Class.

172.  <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the Class because Plaintiffs bought Defendants' Purchased Products during the Class Period.  Defendants' unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Plaintiffs and the Class sustained similar injuries arising out of Defendants' conduct in violation of California law.  The injuries of each member of the Class were caused directly by Defendants' wrongful conduct.  In addition, the factual underpinning of Defendants' misconduct is common to all Class members and represents a common thread of misconduct resulting in injury to all members of the Class.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories.

173.  <u>Adequacy</u>:  Plaintiffs will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor Plaintiffs' counsel have any interests that conflict with or are antagonistic to the interests of the Class members.  Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the members of the Class.  Plaintiffs and Plaintiffs' counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

174.  <u>Superiority</u>:  There is no plain, speedy or adequate remedy other than by maintenance of this class action.  The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.  Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

175.  The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

176.  The prerequisites to maintaining a class action pursuant to Fed. R. Civ. P. 23(b)(3) are met as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

177.  Plaintiffs and Plaintiffs' counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**Business and Professions Code § 17200, *et seq.***

**Unlawful Business Acts and Practices**

178.    Plaintiffs incorporate by reference each allegation set forth above.

179.    Defendants' conduct constitutes unlawful business acts and practices.

180.    Under California law, unlawful conduct, such as Defendants, is the only element necessary for the UCL claim. (*See* ¶ 6). No reliance is necessary.

181.    Defendants sold Purchased Products and Class Products in California during the Class Period.

182.    Each Defendant is a corporation and, therefore, is a "person" within the meaning of the Sherman Law.

183.    Defendants' business practices are unlawful under § 17200, *et seq*. by virtue of Defendants' violations of the advertising provisions of Article 3 of the Sherman Law and the misbranded food provisions of Article 6 of the Sherman Law.

184.    Defendants' business practices are unlawful under § 17200, *et seq*. by virtue of Defendants' violations of § 17500, *et seq.*, which forbids untrue and misleading advertising.

185.    Defendants' business practices are unlawful under § 17200, *et seq*. by virtue of Defendants' violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.

186.    Defendants sold Plaintiffs and the Class Purchased Products and Class Products that were not capable of being sold, or held legally and have no economic value and which were legally worthless. Plaintiffs and the Class lost money as a direct result of Defendants' unlawful conduct.

187.    As a result of Defendants' illegal business practices, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and to restore to any Class Member any money paid for the Purchased Products and Class Products.

188.    Defendants' unlawful business acts present a threat and reasonable continued likelihood of injury to Plaintiffs and the Class.

189.    As a result of Defendants' conduct, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for Defendants' Purchased Products by Plaintiffs and any money paid for Defendants' Class Products purchased by the Class.

**SECOND CAUSE OF ACTION**
**Business and Professions Code § 17200, *et seq.***
**<u>Unfair Business Acts and Practices</u>**

190.    Plaintiffs incorporate by reference each allegation set forth above.

191.    Defendants' conduct as set forth herein constitutes unfair business acts and practices.

192.    Defendants sold Purchased Products and Class Products in California during the Class Period.

193.    Plaintiffs and members of the Class suffered a substantial injury by virtue of buying Defendants' Purchased Products and Class Products that they would not have purchased absent Defendants' illegal conduct.

194.    Defendants' deceptive marketing, advertising, packaging and labeling of their Purchased Products and Class Products and their sale of unsalable misbranded products that were illegal to possess was of no benefit to consumers, and the harm to consumers and competition is substantial.

195.    Defendants sold Plaintiffs and the Class Purchased Products and Class Products that were not capable of being legally sold or held and that have no economic value and were legally worthless. Plaintiffs and the Class paid a premium price for the Purchased Products and Class Products.

196.    Plaintiffs and the Class who purchased Defendants' Purchased Products and Class Products had no way of reasonably knowing that the products were misbranded and were not properly marketed, advertised, packaged and labeled, and thus could not have reasonably avoided the injury each of them suffered.

197.   The consequences of Defendants' conduct as set forth herein outweigh any justification, motive or reason therefor.  Defendants' conduct is and continues to be immoral, unethical, unscrupulous, contrary to public policy, and is substantially injurious to Plaintiffs and the Class.

198.   As a result of Defendants' conduct, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for Defendants' Purchased Products by Plaintiffs and any money paid for Defendants' Class Products purchased the Class.

### THIRD CAUSE OF ACTION
### Business and Professions Code § 17200, *et seq.*
### Fraudulent Business Acts and Practices

199.   Plaintiffs incorporate by reference each allegation set forth above.

200.   Defendants' conduct as set forth herein constitutes fraudulent business practices under California Business and Professions Code sections § 17200, *et seq.*

201.   Defendants sold Purchased Products and Class Products in California during the Class Period.

202.   Defendants' misleading marketing, advertising, packaging and labeling of the Purchased Products and Class Products and misrepresentation that the products were salable, capable of possession and not misbranded were likely to deceive reasonable consumers, and in fact, Plaintiffs and members of the Class were deceived.  Defendants have engaged in fraudulent business acts and practices.

203.   Defendants' fraud and deception caused Plaintiffs and the Class to purchase Defendants' Purchased Products and Class Products that they would otherwise not have purchased had they known the true nature of those products.

204.   Defendants sold Plaintiffs and the Class Purchased Products that were not capable of being sold or held legally and that have no economic value and were legally worthless. Plaintiffs and the Class paid a premium price for the Purchased Products and the Class Products.

205.   As a result of Defendants' conduct as set forth herein, Plaintiffs and the Class, pursuant to Business and Professions Code § 17203, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for Defendants' Purchased Products by Plaintiffs and any money paid for the Class Products by the Class.

**FOURTH CAUSE OF ACTION**
**Business and Professions Code § 17500, _et seq._**
**<u>Misleading and Deceptive Advertising</u>**

206.   Plaintiffs incorporate by reference each allegation set forth above.

207.   Plaintiffs assert this cause of action for violations of California Business and Professions Code § 17500_, et seq._ for misleading and deceptive advertising against Defendants.

208.   Defendants sold Purchased Products and Class Products in California during the Class Period.

209.   Defendants engaged in a scheme of offering Defendants' Purchased Products and Class Products for sale to Plaintiffs and members of the Class by way of product labeling.  These labels misrepresented and/or omitted the true contents and nature of Defendants' Purchased Products and Class Products.  Defendants' advertisements and inducements were made within California and come within the definition of advertising as contained in Business and Professions Code §17500, _et seq._ in that such labels were intended as inducements to purchase Defendants' Purchased Products and Class Products and are statements disseminated by Defendants to Plaintiffs and the Class that were intended to reach members of the Class.  Defendants knew, or in the exercise of reasonable care should have known, that these statements were misleading and deceptive as set forth herein.

210.   In furtherance of its plan and scheme, Defendants prepared and distributed within California and nationwide via product labels, statements that misleadingly and deceptively represented the composition and the nature of Defendants' Purchased Products and Class Products.  Plaintiffs and the Class necessarily and reasonably relied on Defendants' materials, and were the intended targets of such representations.

211.    Defendants' conduct in disseminating misleading and deceptive statements in California and nationwide to Plaintiffs and the Class was and is likely to deceive reasonable consumers by obfuscating the true composition and nature of Defendants' Purchased Products and Class Products in violation of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*

212.    As a result of Defendants' violations of the "misleading prong" of California Business and Professions Code § 17500, *et seq.*, Defendants have been unjustly enriched at the expense of Plaintiffs and the Class.  Misbranded products cannot be legally sold or held and have no economic value and are legally worthless. Plaintiffs and the Class paid a premium price for the Purchased Products and Class Products.

213.    Plaintiffs and the Class, pursuant to Business and Professions Code § 17535, are entitled to an order enjoining such future conduct by Defendants, and such other orders and judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any money paid for Defendants' Purchased Products or Class Products by Plaintiffs and the Class.

**FIFTH CAUSE OF ACTION**
**Business and Professions Code § 17500, *et seq.***
**<u>Untrue Advertising</u>**

214.    Plaintiffs incorporate by reference each allegation set forth above.

215.    Plaintiffs assert this cause of action against Defendants for violations of California Business and Professions Code § 17500, *et seq.*, regarding untrue advertising.

216.    Defendants sold Purchased Products and Class Products in California during the Class Period.

217.    Defendants engaged in a scheme of offering Defendants' Purchased Products and Class Products for sale to Plaintiffs and the Class by way of product labels.  These materials misrepresented and/or omitted the true contents and nature of Defendants' Purchased Products and Class Products.  Defendants' labels were made in California and come within the definition of advertising as contained in Business and Professions Code §17500, *et seq.* in that the labels were intended as inducements to purchase Defendants' Purchased Products and Class Products,

1    and are statements disseminated by Defendants to Plaintiffs and the Class.  Defendants knew, or

2    in the exercise of reasonable care should have known, that these statements were untrue.

3        218.    In furtherance of its plan and scheme, Defendants prepared and distributed in

4    California and nationwide via product labels, statements that falsely advertise the composition of

5    Defendants' Purchased Products and Class Products, and falsely misrepresented the nature of

6    those products.  Plaintiffs and the Class were the intended targets of such representations and

7    would reasonably be deceived by Defendants' materials.

8        219.    Defendants' conduct in disseminating untrue labels throughout California deceived

9    Plaintiffs and members of the Class by obfuscating the contents, nature and quality of

10   Defendants' Purchased Products and Class Products in violation of the "untrue prong" of

11   California Business and Professions Code § 17500.

12       220.    As a result of Defendants' violations of the "untrue prong" of California Business

13   and Professions Code § 17500, *et seq.*, Defendants have been unjustly enriched at the expense of

14   Plaintiffs and the Class.  Misbranded products cannot be legally sold or held and have no

15   economic value and are legally worthless. Plaintiffs and the Class paid a premium price for the

16   Purchased Products and Class Products.

17       221.    Plaintiffs and the Class, pursuant to Business and Professions Code § 17535, are

18   entitled to an order enjoining such future conduct by Defendants, and such other orders and

19   judgments which may be necessary to disgorge Defendants' ill-gotten gains and restore any

20   money paid for Defendants' Purchased Products or Class Products by Plaintiffs and the Class.

21                              **SIXTH CAUSE OF ACTION**
22              **Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.***

     222.    Plaintiffs incorporate by reference each allegation set forth above.
23
     223.    This cause of action is brought pursuant to the CLRA. Defendants' violations of
24
     the CLRA are willful, oppressive and fraudulent, thus supporting an award of punitive damages.
25
     224.    On June 1, 2012, Plaintiffs sent their Notice and Demand Letter pursuant to the
26
27   CLRA, Cal. Civ. Code §§ 1782(a)(1) and (2), via certified mail to counsel for Defendant Procter

28

1  & Gamble at their office in Palo Alto, California. To date, Procter & Gamble has not responded

2  to Plaintiffs' Notice and Demand Letter.

3       225.    Over thirty days have passed since Plaintiffs sent Defendant Procter & Gamble

4  their Notice and Demand Letter. Plaintiffs now seek damages under the CLRA.

5       226.    Plaintiffs and the Class, having given proper notice to Defendant Procter &

6  Gamble, are entitled to actual and punitive damages against Defendant Procter & Gamble for

7  their violations of the CLRA.  In addition, pursuant to Cal. Civ. Code § 1782(a)(2), Plaintiffs and

8  the Class are entitled to an order enjoining the above-described acts and practices, providing

9  restitution to Plaintiffs and the Class, ordering payment of costs and attorneys' fees, and any other

10  relief deemed appropriate and proper by the Court pursuant to Cal. Civ. Code § 1780.

11       227.    Plaintiffs intend to amend this Complaint to seek damages in accordance with the

12  CLRA after providing Defendant Kellogg's with notice pursuant to Cal. Civ. Code § 1782.

13       228.    At the time of any amendment seeking damages under the CLRA, Plaintiffs will

14  demonstrate that the violations of the CLRA by Defendant Kellogg was willful, oppressive and

15  fraudulent, thus supporting an award of punitive damages.

16       229.    Consequently, Plaintiffs and the Class will be entitled to actual and punitive

17  damages against Defendant Kellogg for its violations of the CLRA.  In addition, pursuant to Cal.

18  Civ. Code § 1782(a)(2), Plaintiffs and the Class will be entitled to an order enjoining the above-

19  described acts and practices, providing restitution to Plaintiffs and the Class, ordering payment of

20  costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court

21  pursuant to Cal. Civ. Code § 1780.

22       230.    Defendants' actions, representations and conduct have violated, and continue to

23  violate the CLRA, because they extend to transactions that are intended to result, or which have

24  resulted, in the sale of goods to consumers.

25       231.    Defendants sold Purchased Products and Class Products in California and

26  throughout the United States during the Class Period.

27       232.    Plaintiffs and members of the Class are "consumers" as that term is defined by the

28  CLRA in Cal. Civ. Code §1761(d).

233.    Defendants' Purchased Products and Class Products were and are "goods" within the meaning of Cal. Civ. Code §1761(a).

234.    By engaging in the conduct set forth herein, Defendants violated and continues to violate Sections 1770(a)(5) of the CLRA, because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they misrepresent the particular ingredients, characteristics, uses, benefits and quantities of the goods.

235.    By engaging in the conduct set forth herein, Defendants violated and continue to violate Section 1770(a)(7) of the CLRA, because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices in that they misrepresent the particular standard, quality or grade of the goods.

236.    By engaging in the conduct set forth herein, Defendants violated and continue to violate Section 1770(a)(9) of the CLRA, because Defendants' conduct constitute unfair methods of competition and unfair or fraudulent acts or practices in that they advertise goods with the intent not to sell the goods as advertised.

237.    By engaging in the conduct set forth herein, Defendants have violated and continue to violate Section 1770(a)(16) of the CLRA, because Defendants' conduct constitute unfair methods of competition and unfair or fraudulent acts or practices in that they represent that a subject of a transaction has been supplied in accordance with a previous representation when it has not.

238.    Plaintiffs requests that the Court enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to Cal. Civ. Code § 1780(a)(2) and award Plaintiffs actual and punitive damages. If Defendants are not restrained from engaging in these practices in the future, Plaintiffs and the Class will continue to suffer harm.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of their claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, and on behalf of the general public, pray for judgment against Defendants as follows:

1      A.      For an order certifying this case as a class action and appointing Plaintiffs and

2  their counsel to represent the Class;

3      B.      For an order awarding, as appropriate, damages, restitution or disgorgement to

4  Plaintiffs and the Class;

5      C.      For an order requiring Defendants to immediately cease and desist from selling

6  their Purchased Products and Class Products listed in violation of law; enjoining Defendants from

7  continuing to market, advertise, distribute, and sell these products in the unlawful manner

8  described herein; and ordering Defendants to engage in corrective action;

9      D.      For remedies, as appropriate, pursuant to Cal. Civ. Code § 1780;

10     E.      For an order awarding attorneys' fees and costs;

11     F.      For an order awarding punitive damages;

12     G.      For an order awarding pre-and post-judgment interest; and

13     H.      For an order providing such further relief as this Court deems proper.

14  Dated:  July 2, 2013                       Respectfully submitted,

15

16                                               _s/Ben F. Pierce Gore_____
                                                 Ben F. Pierce Gore (SBN 128515)
17                                               PRATT & ASSOCIATES
                                                 1871 The Alameda, Suite 425
18                                               San Jose, CA 95126
                                                 Telephone:  (408) 429-6506
19                                               Fax:  (408) 369-0752
                                                 pgore@prattattorneys.com

20                                               David McMullan, Jr. (admitted *pro hac vice*)
                                                 Don Barrett, P.A.
21                                               404 Court Square North
                                                 P.O. Box 927
22                                               Lexington, MS 39095
                                                 Telephone: (662) 834-2488
23                                               Fax: (662) 834-2628
                                                 dmcmullan@barrettlawgroup.com
24                                               *Attorneys for Plaintiffs*

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT                                               46
CASE NO. 5:12-cv-01891 (PSG)

1

<u>CERTIFICATE OF SERVICE</u>

2

      I hereby certify that a true and correct copy of the forgoing was filed and served via the Court's ECF filing system this 2nd day of July, 2013.

3

4

                    */s/  Ben F. Pierce Gore*           
                    Ben F. Pierce Gore

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT
CASE No. 5:12-CV-01891 (PSG)

47