1  Robert A. Mittelstaedt (State Bar No. 60359)
   ramittelstaedt@jonesday.com
2  Craig E. Stewart (State Bar No. 129530)
   cestewart@jonesday.com
3  JONES DAY
   555 California Street, 26th Floor
4  San Francisco, California 94104
   Telephone:    415-626-3939
5  Facsimile:    415-875-5700

6  Brian Selden (State Bar No. 261828)
   bgselden@jonesday.com
7  JONES DAY
   1755 Embarcadero Road
8  Palo Alto, California 94303
   Telephone:    650-739-3939
9  Facsimile:    650-739-3900

10 Jonathan Berman (State Bar No. 167006)
   jberman@jonesday.com
11 JONES DAY
   51 Louisiana Avenue, NW
12 Washington, DC 20001
   Telephone:    202-879-3939
13 Facsimile:    202-626-1700

14 Attorneys for Defendant
   THE PROCTER & GAMBLE CO.

15

16                    UNITED STATES DISTRICT COURT

17         NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

18

19 SARAH SAMET and JAY PETERS,            **Case No. 5:12-cv-01891-PSG**
   individually and on behalf of all others
20 similarly situated,
                                          **DEFENDANT THE PROCTER &**
21              Plaintiffs,                **GAMBLE COMPANY'S MOTION TO**
                                          **DISMISS SECOND AMENDED**
22        v.                              **COMPLAINT**

23 THE PROCTER & GAMBLE COMPANY,          Date:  October 1, 2013
   KELLOGG COMPANY and KELLOGG            Time:  10:00 a.m.
24 SALES COMPANY,                         Place: Courtroom 5 - 4th Floor

25              Defendants.

26

27

28

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ................................................................................1

RELIEF SOUGHT ................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................1

INTRODUCTION .................................................................................................................1

STATEMENT OF ISSUES TO BE DECIDED ...................................................................2

BACKGROUND ...................................................................................................................3

ARGUMENT .........................................................................................................................4

I.    LEGAL STANDARD..................................................................................................4

II.   PLAINTIFFS' FALSE ADVERTISING CLAIMS TO SUFFER FROM FATAL
      DEFECTS, INCLUDING THOSE THIS COURT PREVIOUSLY IDENTIFIED................5

      A.    Plaintiffs Fail To State A False Advertising Claim Based On The "0g Trans
            Fat" Statement...........................................................................................................5

            1.    Plaintiffs Fail To Allege Facts Plausibly Showing How They Were
                  Misled By The True Statement "0g Trans Fat." ....................................5

            2.    Here, The "0g Trans Fat" Statement Is Not Misleading As A Matter of
                  Law.........................................................................................................8

      B.    All The Defects The Court Identified In Plaintiffs' "Wholesome Ingredients"
            Claim Persist, Requiring Dismissal Of That Claim....................................................13

      C.    Plaintiffs Do Not Allege Facts Showing that Pringles Contained Any Non-
            Functional Slack-Fill......................................................................................................15

III.  PLAINTIFFS FAIL TO STATE A UCL "UNLAWFUL" CLAIM. .....................................15

      A.    Plaintiffs Must Establish Deception and Reliance Even For Their "Unlawful
            Conduct" Claim. .............................................................................................................16

      B.    Plaintiffs Cannot Establish Economic Injury Based Solely On The Purchase
            Of An Allegedly "Unlawful" Product. ........................................................................18

      C.    Plaintiffs' Unlawful Prong Claim—Which Is Not Based On Deception— Is
            Preempted. ......................................................................................................................20

IV.   PLAINTIFFS' "0G TRANS FAT" CLAIMS AS TO PRINGLES REDUCED FAT
      AND PRINGLES 100 CALORIE PACKS INDEPENDENTLY FAIL...............................22

CONCLUSION ......................................................................................................................23

Mot. to Dismiss Second Amended Complaint
No. 12-cv-01891-PSG

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES**

*Alberty Food Prods. Co. v. United States*,
   185 F.2d 321 (9th Cir. 1950) ................................................................................................ 14

*Arroyo v. Pfizer, Inc.*,
   No. 12-cv-4030, 2013 WL 415607 (N.D. Cal. Jan. 31, 2013) .................................................. 8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................... 4, 20

*Baird v. Sabre, Inc.*,
   No. 2:13-cv-00999, 2013 BL 201323 (C.D. Cal. July 25, 2013) .............................................. 19

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................... 15

*Boorstein v. Men's Journal LLC*,
   No. 12-cv-771, 2012 WL 2152815 (C.D. Cal. June 14, 2012) ............................................... 19

*Bronson v. Johnson & Johnson, Inc.*,
   No. 12-cv-04184, 2013 WL 1629191 (N.D. Cal. Apr. 16, 2013) ........................................... 14

*Buckman v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ................................................................................................. 20, 21

*Carrea v. Dreyer's Grand Ice Cream, Inc.*,
   475 F. App'x 113 (9th Cir. 2012) ......................................................................................... 11

*Chacanaca v. Quaker Oats Co.*,
   752 F. Supp. 2d 1111 (N.D. Cal. 2010) ............................................................................... 10

*Cytosport, Inc. v. Vital Pharm., Inc.*,
   894 F. Supp. 2d 1285 (E.D. Cal. 2012) ............................................................................... 14

*Delacruz v. Cytosport, Inc.*,
   No. 11-cv-3532, 2012 WL 2563857 (N.D. Cal. June 28, 2012) .................................... 8, 9, 10

*Freeman v. Time, Inc.*,
   68 F.3d 285 (9th Cir. 1995) ......................................................................................... 10, 12

*Hairston v. S. Beach Beverage Co.*,
   No. 12-cv-1429, 2012 WL 1893818 (C.D. Cal. May 18, 2012) .............................. 10, 11, 12

*Henderson v. Gruma Corp.*,
   No. 10-cv-04173, 2011 WL 1362188 (C.D. Cal. Apr. 11, 2011) ...................................... 7, 11

Mot. to Dismiss Second Amended Complaint
No. 12-cv-01891-PSG

*Herrington v. Johnson & Johnson Consumer Cos., Inc.*,
  No. 09-cv-1597, 2010 WL 3448531 (N.D. Cal. Sept. 1, 2010) ........................ 10, 18

*Holistic Candlers & Consumers Ass'n v. FDA*,
  664 F.3d 940 (D.C. Cir. 2012) ................................................................ 14

*Hovsepian v. Apple, Inc.*,
  No. 08-5788, 2009 WL 2591445 (N.D. Cal. Aug. 21, 2009) ........................... 13

*In re Actimmune Mktg. Litig.*,
  No. 08-cv-02376, 2010 WL 3463491 (N.D. Cal. Sep. 1, 2010) ........................... 18

*In re Ditropan XL Antitrust Litig.*,
  529 F. Supp. 2d 1098 (N.D. Cal. May 11, 2007) ...................................... 17

*In re Steroid Hormone Prod. Cases*,
  181 Cal. App. 4th 145 (2010) ............................................................. 17

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009) ................................................................... 17

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ............................................................. 4

*Kordel v. United States*,
  335 U.S. 345 (1948) ...................................................................... 14

*Kwikset Corp. v. Super. Ct.*,
  51 Cal. 4th 310 (2011) ......................................................... 7, 16, 17, 19

*Lam v. Gen. Mills, Inc.*,
  859 F. Supp. 2d 1097 (N.D. Cal. 2012) ................................................... 13

*Lavie v. Procter & Gamble Co.*,
  105 Cal. App. 4th 496 (2003) .............................................................. 4

*McKinniss v. Sunny Delight Beverages Co.*,
  No. 07-cv-02034, 2007 WL 4766525 (C.D. Cal. Sept. 4, 2007) .................... 11, 12

*Medrazo v. Honda of N. Hollywood*,
  205 Cal. App. 4th 1 (2012) ............................................................... 17

*Miller v. Hearst Commc'ns, Inc.*,
  No. 12-cv-0733, 2012 WL 5439897 (C.D. Cal. Nov. 7, 2012) ......................... 19

*Myers-Armstrong v. Actavis Totowa, LLC*,
  No. 08-cv-04741, 2009 WL 1082026 (N.D. Cal. Apr. 22, 2009) ..................... 18

*Olivera v. Am. Home Mortg. Servicing, Inc.*,
  689 F. Supp. 2d 1218 (N.D. Cal. 2010) ................................................... 17

*Olson v. Cohen*,
 106 Cal. App. 4th 1209 (2003) ............................................................................ 18

*Perez v. Nidek Co., Ltd.*,
 711 F.3d 1109 (9th Cir. 2013) ........................................................................ 20, 21

*Rand v. Am. Nat'l Ins. Co.*,
 No. 09-cv-063951, 2010 U.S. Dist. LEXIS 82584 (N.D. Cal. June 22, 2010) ...... 17

*Red v. Kraft Foods, Inc.*,
 No. 10-cv-1028, 2012 WL 5504011 (C.D. Cal. Oct. 25, 2012) .................... 11, 12

*Ries v. Ariz. Beverages USA, LLC*,
 287 F.R.D. 523 (N.D. Cal. 2012) ........................................................................ 17

*Ries v. Hornell Brewing Co.*,
 No. 5:10-cv-01139, 2011 WL 1299286 (N.D. Cal. Apr. 4, 2011) ........................ 13

*Rooney v. Cumberland Packaging Corp.*,
 No. 12-CV-0033, 2012 WL 1512106 (S.D. Cal. Apr. 16, 2012) .......................... 10

*Stearns v. Ticketmaster Corp.*,
 655 F.3d 1013 (9th Cir. 2011) ............................................................................ 17

*Sybersound Records, Inc. v. UAV Corp.*,
 517 F.3d 1137 (9th Cir. 2008) .............................................................................. 4

*Thomas v. Costco*,
 No. 12-cv-02908, 2013 WL 1435292 (N.D. Cal. Apr. 9, 2013) .................. 8, 9, 10

*Vess v. Ciba-Geigy Corp. USA*,
 317 F.3d 1097 (9th Cir. 2003) .............................................................................. 4

*Videtto v. Kellogg USA*,
 No. 2:08-cv-01324, 2009 WL 1439086 (E.D. Cal. May 21, 2009) ...................... 11

*Viggiano v. Hansen Natural Corp.*,
 No. 12-cv-10747, 2013 WL 2005430 (C.D. Cal. May 13, 2013) .................. 11, 12

*Villegas v. Wells Fargo Bank, N.A.*,
 No. 12-cv-02004, 2012 WL 2931343 (N.D. Cal. July 17, 2012) ........................... 8

*Weisbuch v. Cnty. of L.A.*,
 119 F.3d 778 (9th Cir. 1997) .............................................................................. 22

*Werbel v. PepsiCo, Inc.*,
 No. 09-cv-04456, 2010 WL 2673860 (N.D. Cal. July 2, 2010) ........................... 11

*Williams v. Gerber Prods. Co.*,
 552 F.3d 934 (9th Cir. 2008) .............................................................................. 12

Mot. to Dismiss Second Amended Complaint
                                                      No. 12-cv-01891-PSG

*Williamson v. Apple*,
   No. 11-cv-00377, 2012 WL 3835104 (N.D. Cal. Sept. 4, 2012) ........................................... 11

*Wilson v. Frito-Lay N. Am., Inc.*,
   No. 12-cv-1586, 2013 WL 1320468 (N.D. Cal. Apr. 1, 2013) ....................................... 10, 14

STATUTES

15 U.S.C. § 55(a) ......................................................................................... 14

21 U.S.C. § 321(m) ...................................................................................... 14

21 U.S.C. § 343(a) ....................................................................................... 14

21 U.S.C. § 371 ........................................................................................... 14

Cal. Bus. & Prof. Code § 17204 ................................................................. 19

Cal. Bus. & Prof. Code § 17533.7 .............................................................. 16

Cal. Health & Safety Code § 110665 .......................................................... 21

Cal. Health & Safety Code § 110735 .......................................................... 21

OTHER AUTHORITIES

21 C.F.R. § 10.85(k) .................................................................................... 14

21 C.F.R. § 100.100 ..................................................................................... 15

21 C.F.R. § 101.13 .......................................................................... 6, 9, 10, 22

21 C.F.R. § 105.3(a)(1) ................................................................................ 22

FED. R. CIV. P. 9(b) ............................................................................. passim

Mot. to Dismiss Second Amended Complaint
No. 12-cv-01891-PSG

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on October 1, 2013, at 10:00 a.m., or as soon thereafter as the matter may be heard, defendant The Procter & Gamble Co. will and hereby does move to dismiss plaintiffs' Second Amended Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b).

**RELIEF SOUGHT**

The Procter & Gamble Co. seeks dismissal of all claims against it.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Plaintiffs' Second Amended Complaint cures none of the defects that led the Court to dismiss their Amended Complaint. To the contrary, the new complaint only confirms that the entire case should be dismissed with prejudice.

The Court dismissed plaintiffs' "0g trans fat" claim on the ground that the plaintiffs did not allege facts showing how they were actually mislead. Plaintiffs still have not done so. Their new complaint simply repeats the assertions of the previous complaint, without adding anything of substance. Plaintiffs intone that the Pringles label misled them regarding the total fat content in Pringles and made them think Pringles make "only positive contributions to a diet." But they still do not explain how a truthful statement about the absence of one nutrient (trans fat) could have led them to conclude anything about the level of other nutrients, let alone to a conclusion about the overall healthfulness of a snack food like Pringles. They still do not allege that they did not read the Nutrition Facts box, in which each of the allegedly harmful nutrients was fully disclosed. Nor do they state unambiguously that they were unaware of the total fat content in Pringles, even though that allegation is critical to their claim. Their inability to make even these most basic allegations should remove any doubt that they have not, and cannot, state a valid false advertising claim. Not only have they failed to allege facts showing how they personally were misled, they have not shown that the label is false or misleading at all under the governing reasonable consumer standard.

Mot. to Dismiss Second Amended Complaint
No. 12-cv-01891-PSG

1    Plaintiffs have likewise not remedied the problems in their "wholesome ingredients"

2   claim.  As before, they do not allege the context in which the alleged statement was made, how it

3   misled them, or that it appeared on Pringles labeling.  Indeed, they do not claim even that they

4   saw and relied upon the alleged "wholesome" representation.

5    Plaintiffs' slack fill claim is also invalid, as they still do not allege any facts showing the

6   amount of any empty space in the Pringles container, let alone that any such space is non-

7   functional—both of which are required elements of their claim.

8    Rather than cure these fundamental defects, plaintiffs shift their focus to the UCL

9   "unlawful" or "misbranding" part of their case.  They assert they do not need even to have seen

10   the alleged labeling violations, let alone have been misled by them, to recover the full purchase

11   price of the Pringles they bought.  But the courts have repeatedly rejected the notion that a party

12   suffers a cognizable injury merely by having purchased a product or service that is not defective

13   or deceptively advertised but is alleged only to have violated a regulatory requirement.

14   Permitting such a suit would effectively be to sanction a return to the days before Proposition 64

15   added the economic injury requirement to the UCL, when litigants could file unfair competition

16   lawsuits based solely on the alleged existence of a regulatory violation without any proof that it

17   harmed them.

18    Plaintiffs have now filed three complaints against P&G, each of them fundamentally

19   defective.  Their repeated failure to state a valid claim means this Court should dismiss the case

20   with prejudice.

21    **STATEMENT OF ISSUES TO BE DECIDED**

22    1.    Does plaintiffs' "0g trans fat" claim satisfy Rule 9(b) where plaintiffs fail to allege

23   how they were misled given the label's full disclosure of the product's nutrition information?

24    2.    Is the true statement "0g trans fat" misleading to a reasonable consumer where it

25   appears on the label of Pringles—a snack food—along with all of the product's other nutrient

26   content information?

27    3.    Does plaintiffs' "wholesome" claim fail where they do not allege that they saw or

28   relied on the alleged representation, and where they do not allege the entire statement, how it

1  misled them, or specifically where it appeared, except to say it was on P&G's website, which this

2  Court has held does not constitute labeling?

3      4.    Have plaintiffs alleged a valid "slack fill" claim when they allege no facts

4  regarding the amount of any empty space or whether it is non-functional?

5      5.    Have plaintiffs alleged a valid claim under the UCL's unlawful prong?

6  **<u>BACKGROUND</u>**

7      Plaintiffs assert three basic claims against P&G:  (1) that the statement "0g trans fat" on

8  the Pringles label was misleading and violated FDA regulations, (2) that P&G unlawfully and

9  misleadingly described Pringles as being made with "wholesome ingredients" and (3) that

10  Pringles packages contain slack fill.

11      On June 18, 2013, this Court dismissed plaintiffs' "0g trans fat" and  "wholesome" claims.

12  As to the "0g trans fat" claim, the Court ruled that plaintiffs had "not alleged in the detail required

13  by Rule 9(b) how [they] were actually misled," and advised that—to state a valid claim—they

14  "must offer more than their legal conclusion that they were 'unaware' that the products were

15  'misbranded' and contained fat content in excess of the amounts set forth in FDA regulations."

16  Doc. 89, p. 19.

17      As to the "wholesome" claim, the Court ruled the allegations "f[e]ll[] far short of the

18  pleading requirements of Rule 9(b)" because plaintiffs failed to "provide the entire statement, [or]

19  . . . attach the relevant label[,] [or]. . . clarify which products are specifically at issue, where the

20  statements were found, and how Plaintiffs were actually misled."  *Id.* at 20.  The Court further

21  ruled that a website can be considered labeling "[o]nly if the plaintiff establishes that the label

22  contains a specific statement referring the consumer to a specific website for information about

23  the claim in question," and concluded that plaintiffs had "not alleged facts supporting their claim

24  that [P&G's] website constitutes 'labeling.'"  *Id.* at 20-21.

25      The Court declined to dismiss the slack fill claim, stating that the plaintiffs adequately

26  alleged facts showing they "thought they were receiving more of the product than they actually

27  received."  *Id.* at 19.  Finally, the Court concluded that plaintiffs' claims were not preempted by

28  the federal Food Drug and Cosmetic Act ("FDCA") to the extent they sought to "vindicate the

Mot. to Dismiss Second Amended Complaint
No. 12-cv-01891-PSG

1    separate and independent right to be free from deceptive and misleading advertising." Doc. 89,

2    p. 15.

3        Plaintiffs have now filed their Second Amended Complaint ("SAC"), asserting again the

4    same three basic claims as the earlier Amended Complaint ("AC").  For the reasons discussed

5    below, this new complaint does not cure the defects the Court found in their previous complaint.

6    It should accordingly be dismissed.

7                                    **ARGUMENT**

8    **I.    LEGAL STANDARD**

9        To survive a motion to dismiss, a complaint must plead sufficient "factual content" to

10   state a claim that is plausible on its face if accepted as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662,

11   678 (2009).  The Court need not accept as true allegations that are conclusory, legal conclusions,

12   unwarranted deductions of fact, or unreasonable inferences.  *Id.* at 678-79.

13       To state a false advertising claim under the UCL, FAL, or CLRA, a plaintiff must show

14   that "members of the public are likely to be deceived." *Sybersound Records, Inc. v. UAV Corp.*,

15   517 F.3d 1137, 1152 (9th Cir. 2008) (citation and internal quotation marks omitted).  "'Likely to

16   deceive' implies more than a mere possibility that the advertisement might conceivably be

17   misunderstood by some few consumers viewing it in an unreasonable manner.  Rather, the phrase

18   indicates that the ad is such that it is probable that a significant portion of the general consuming

19   public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Lavie*

20   *v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).

21       When alleging a claim sounding in fraud, a plaintiff must plead the fraud with

22   particularity, including "the who, what, when, where, and how of the misconduct charged." *Vess*

23   *v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103, 1106 (9th Cir. 2003) (internal quotation marks

24   omitted); *see also* FED. R. CIV. P. 9(b).  A "plaintiff must set forth what is false or misleading

25   about a statement, and why it is false." *Vess*, 317 F.3d at 1106 (internal quotation marks

26   omitted).  This is true as well for claims under the UCL, FAL, or CLRA that are "'grounded in

27   fraud' or . . . 'sound in fraud.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009)

28   (*quoting Vess*, 317 F.3d at 1103-04).

II.     **PLAINTIFFS' FALSE ADVERTISING CLAIMS TO SUFFER FROM FATAL DEFECTS, INCLUDING THOSE THIS COURT PREVIOUSLY IDENTIFIED.**

A.      **Plaintiffs Fail To State A False Advertising Claim Based On The "0g Trans Fat" Statement.**

1.      **Plaintiffs Fail To Allege Facts Plausibly Showing How They Were Misled By The True Statement "0g Trans Fat."**

The Court dismissed plaintiffs' "0g trans fat" claim for failure to adequately plead *facts* – not "conclusions" – showing how they were actually misled.  Doc. 89, p. 19.  Plaintiffs have not cured that defect.  Their new complaint now includes a subsection that purports to contain allegations "pursuant to Federal Rule of Civil Procedure 9(b)" as to "their misleading claim." Doc. 90 ¶¶ 81-86.  These paragraphs, however, only repeat in more words the same inadequate conclusions from the AC, without adding anything of substance.

Like the AC, the SAC's central allegation is that plaintiffs were misled into believing "that the product made only positive contributions to their diet."  Doc. 90, ¶ 82; *compare* Doc. 25, ¶ 137 (plaintiffs were allegedly misled into believing that the "Misbranded Food Product they bought made only positive contribution to a diet").  In the AC, plaintiffs alleged that they were misled into believing that the product "did not contain any nutrients or calories at levels that raised the risk of diet-related disease or health-related condition."  Doc. 25 ¶ 137.  Now they dress up that allegation slightly by asserting that they were "misled to believe the products did not contain fat, cholesterol, sodium, and other negative food attributes at levels that may increase the risk of disease or health related conditions."  Doc. 90 ¶ 82.  Similarly, in the AC they alleged that P&G failed "to disclose the presence of risk-increasing nutrients."  Doc. 25 ¶ 137.  Now they embellish that a bit by saying that P&G failed to "disclose the high fat and other deleterious attributes of its food."  Doc. 90 ¶ 83.  And they add that they were "misled to believe [Pringles] were low in fat, and heart and overall healthy, etc."  *Id.* ¶ 85.

What's missing in all of these allegations in the SAC, just as it was in the AC, are any facts plausibly suggesting **how** plaintiffs were misled into these supposed beliefs, as this Court has said they must allege.  Doc. 89, p. 19.  If it were enough for plaintiffs simply to allege in

Mot. to Dismiss Second Amended Complaint
No. 12-cv-01891-PSG

conclusory terms that they were misled, the AC would have been sufficient.  By dismissing the AC, the Court recognized that the circumstances here require more.  These circumstances include:

- The Pringles label prominently discloses the very facts plaintiffs allege were not disclosed, including specifically the total fat, saturated fat, cholesterol and sodium content of the product.[1]

- Nothing on the label suggests that Pringles are anything but a snack food.  The label does not anywhere say, in words or in substance, that the snack makes only "positive contributions to a diet."  Indeed, it is implausible to think that anyone choosing a snack food like potato chips would entertain any such notion.

- The "0g trans fat" statement describes only the trans fat content.  This is not a representation that other types of fat or other similar nutrients are missing, any more than saying "gluten-free" means that a loaf of bread is low in carbohydrates or has no sugar, salt or eggs in it.

- If anything, by stating that the product has 0g of *trans* fat – rather than that it is "fat free" – the label implies that it contains other types of fact, as expressly disclosed in the nutrition facts box.

Far from offering facts explaining how plaintiffs were actually misled in these circumstances, the SAC only confirms the absence of such facts.  Plaintiffs point to the absence of a reference statement under 21 C.F.R. § 101.13(h), but they do not allege that they read only the "0g trans fat" statement and not the Nutrition Facts box, which fully disclosed the fat and other nutrition content of Pringles.  Nor do they unambiguously allege that they were unaware of Pringles' fat content.  P&G identified this latter deficiency in its two previous motions to dismiss, and yet plaintiffs *still* fail to make that crucial allegation.  Doc. 20, p. 11; Doc. 41, p. 10.  Consequently, the Court can reasonably conclude that plaintiffs cannot allege that lack of knowledge because, being "health conscious" consumers who "care about the nutritional content

---

[1] The Court previously took judicial notice of the labels, as shown in P&G's request for judicial notice.  *See* Doc. 89, pp. 4-5; Doc. 40, Exs. 1-5.  P&G requests that the Court do so again on this motion.

Mot. to Dismiss Second Amended Complaint
No. 12-cv-01891-PSG

1    of food and seek to maintain a healthy diet" (Doc. 90 ¶¶ 83, 158), they **did** read the nutrition

2    information and were aware of Pringles' fat content.  By itself, plaintiffs' persistent failure to

3    allege that they did not know the total amount of fat in Pringles is fatal to the "0g trans fat" claim.

4    Without that allegation, they cannot claim that they were "actually misled" as this Court order

5    requires.  Doc. 89, p. 19.  Nor can they plausibly allege reliance on the allegedly deceptive "0g

6    trans fat" statement, as they must.  *See Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 326-27

7    (2011) (where a UCL or FAL claim relies on a fraud theory, the plaintiff "must demonstrate

8    actual reliance") (internal quotation marks omitted); *Henderson v. Gruma Corp*., No. 10-cv-

9    04173, 2011 WL 1362188, at *6 (C.D. Cal. Apr. 11, 2011) ("CLRA requires a demonstration of

10   actual reliance").

11        But even if plaintiffs had alleged that they read only the "0g trans fat" statement and

12   nothing else on the label, that still would not be enough, as this Court recognized.  Doc. 89, p. 19

13   (ruling that plaintiffs must do more than assert they were unaware that Pringles "contained fat

14   content in excess of the amounts set forth in the FDA regulations").  Although plaintiffs'

15   complaint repeats like a mantra that they believed Pringles make "only made positive

16   contributions to their diet" and does not contain any "deleterious attributes," plaintiffs allege no

17   facts showing how they leaped to those conclusions from the accurate statement that Pringles do

18   not contain trans fat.  Nor is it plausible that they actually so concluded.  On what basis did they

19   conclude, from a statement about one nutrient, that no other nutrients existed at allegedly harmful

20   levels?  How was it that they believed that a snack food like potato crisps contains only beneficial

21   ingredients?  Their complaint sheds no light on these crucial questions.

22        Plaintiffs assert that the label led them to believe that "Pringles were a better and healthier

23   choice than other potato snack products."  Doc. 90 ¶ 82.  No facts are alleged to explain this

24   assertion.  Nothing on the Pringles label makes any comparison to other snack products.  Nor do

25   plaintiffs point to anything suggesting that Pringles are not in fact healthier than other similar

26   potato snack products, either because they do not contain trans fat or for some other reason.  This

27   allegation thus just further illustrates the inadequacy of plaintiffs' complaint.  Rather than

28

1    alleging facts showing how they were actually misled, as this Court directed, they allege only

2    unsupported conclusions that are implausible on their face.

3         Because plaintiffs fail to allege with particularity facts showing **how** they were misled by

4    the statement "0g trans fat," their false advertising claims premised on that statement must be

5    dismissed.  *See* Doc. 89, p. 19; *Arroyo v. Pfizer, Inc.*, No. 12-cv-4030, 2013 WL 415607, at *4

6    (N.D. Cal. Jan. 31, 2013) (dismissing UCL, FAL, and CLRA claims based on allegedly deceptive

7    labeling and advertising where plaintiff failed to allege "facts substantiating why . . . Defendant's

8    statements were false or misleading"); *Villegas v. Wells Fargo Bank, N.A.*, No. 12-cv-02004,

9    2012 WL 2931343, at *7 (N.D. Cal. July 17, 2012) (dismissing UCL claim where plaintiffs did

10   "not explain[] how members of the public are likely to be deceived by the misrepresentations that

11   Plaintiffs accuse Wells Fargo of making").

12               **2.    Here, The "0g Trans Fat" Statement Is Not Misleading As A Matter of**

13                       **Law.**

14        Plaintiffs' inability to allege facts showing how they were misled reflects a more

15   fundamental problem with their claim.  Not only have plaintiffs failed to show that they were

16   actually misled, they have not shown that the Pringles label could mislead a reasonable consumer

17   and thus be actionable in the first place as false or misleading.  Because the Court dismissed the

18   AC on the former ground, it did not decide the latter ground in its previous order.  Doc. 89, p. 19

19   (noting that it "*may* be true here" that "the statement '0g Trans Fat' *could* mislead a reasonable

20   consumer," but not resolving that issue) (emphasis added).  But the SAC leaves no doubt that the

21   claim can and should be dismissed on the latter ground as well.

22        That was the ruling of the only two decisions that have involved a "0g trans fat" claim like

23   the one here.  *See Thomas v. Costco*, No. 12-cv-02908, 2013 WL 1435292 (N.D. Cal. Apr. 9,

24   2013); *Delacruz v. Cytosport, Inc.*, No. 11-cv-3532, 2012 WL 2563857 (N.D. Cal. June 28,

25   2012).  In both cases, the plaintiffs pursued the same basic theory as plaintiffs do here—*i.e.*, that

26   the label was misleading because it accurately stated that the product contained "0g trans fat," but

27

28

                                   - 8 -          Mot. to Dismiss Second Amended Complaint
                                                  No. 12-cv-01891-PSG

1   failed to include the § 101.13(h) disclosure statement.[2]  Indeed, in *Thomas*, the allegations are

2   essentially verbatim to those here (reflecting that the complaints were filed by the same counsel).

3   The *Thomas* plaintiffs alleged they did not know that the potato chips "contained one or more

4   nutrients like total fat at levels in the food that, according to the FDA, 'may increase the risk of

5   disease or health related condition that is diet related.'" *Thomas*, No. 12-cv-02908, ECF No. 24 ¶

6   100.  *Cf.* Doc. 90 ¶ 82 ("Plaintiffs were further unaware that Defendants' Pringles snack chips

7   contained total fat at levels in the food that, according to the FDA, 'may increase the risk of

8   disease or health related condition that is diet related'").  The *Thomas* plaintiffs also alleged that

9   the potato chip label, including the "0g trans fat" statement, "conveyed . . . the net impression that

10  the [potato chips] made only positive contributions to a diet." *Thomas*, No. 12-cv-02908, ECF

11  No. 24 ¶ 166. *Cf.* Doc. 90 ¶ 82 ("0g Trans Fat" claim "misled [plaintiffs] to believe that the

12  product only made positive contributions to their diet").  Like plaintiffs here, the *Thomas*

13  plaintiffs did "not allege that the product in question actually contained any amount of trans fat,

14  which would be contrary to the assertions on the label."  2013 WL 1435292 at *5.

15      In *Thomas*, Judge Davila ruled that these allegations failed to state a claim because they

16  "fail[ed] to sufficiently allege that [the 'No Trans Fat' and '0 grams trans fat'] representations

17  were untruthful or misleading."  *Id.*  So too here, plaintiffs have not "sufficiently allege[d] that

18  [the '0g trans fat'] representation[ was] untruthful or misleading" because they do not claim the

19  statement was false or otherwise allege how it was deceptive.  *Id.*

20      In *Delacruz*, Judge Wilken likewise dismissed the claim, holding that the label statement

21  did "not amount to a false statement or misrepresentation."  2012 WL 2563857, at *8.  In its order

22  on the AC, this Court suggested that Judge Wilken did not rule on whether the statement was

23  misleading, even if not literally false.  Her order, however, addresses both.  She specifically

24  recognized that "[c]laims of deceptive labeling under [the UCL, CLRA and FAL] are evaluated

25

26  [2]      *See Thomas*, No. 12-cv-02908 EJD, ECF No. 24 ¶¶ 85-91; *Delacruz*, 2012 WL 2563857,
    at *4 (plaintiff alleged label was "misleading because it states '0g Trans Fat,' while the product
27  contains more than four grams of saturated fat and its label omits the disclosure statement, 'See
    nutrition information for saturated fat content'").  *Cf.* Doc.  90 ¶¶ 8, 56, 63.
28

1  by whether a 'reasonable consumer would be likely to be *deceived*" (*id.* at *6, emphasis added)

2  and she repeatedly described the plaintiff as claiming that the statement was misleading, not false.

3  *Id.* at *4 ("Plaintiff claims that . . . the bars' label is misleading because it states '0g Trans Fat'");

4  *id.* at *8 ("Plaintiff . . . does not claim that the statement misrepresents the amount of trans fat in

5  the bars"). Thus, it is beyond question that, when she dismissed the complaint in its entirety,

6  Judge Wilken was ruling that the statement was neither false nor misleading.

7      This Court also referred to *Wilson v. Frito-Lay N. Am., Inc.*, No. 12-cv-1586, 2013 WL

8  1320468 (N.D. Cal. Apr. 1, 2013), as holding a "0g trans fat" statement could be misleading.

9  Doc. 89, p. 19. In that case, however, the label allegedly contained an ***inaccurate*** 21 C.F.R.

10  § 101.13 disclosure statement, which directed consumers to the product's total saturated fat but

11  not its total fat. 2013 WL 1320468, at *8. Because the disclosure statement itself was

12  misleading, Judge Conti reasoned that the plaintiffs had sufficiently alleged that the label could

13  mislead a reasonable consumer. 2013 WL 1320468, at *14. By contrast, here (as in *Thomas* and

14  *Delacruz*) there is no allegation that the label featured an inaccurate § 101.13(h)(1) disclosure

15  statement, and thus *Wilson* has no application.[3]

16      The decisions in *Thomas* and *Delacruz* are consistent with numerous decisions rejecting

17  false advertising claims at the pleading stage when no reasonable consumer was likely to be

18  deceived.[4] As these cases recognize, in evaluating whether the complaint is sufficient, the court

19  _____

20  [3]   *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111 (N.D. Cal. 2010), likewise did not
    resolve the issue here. The court there simply described the FDA regulation before concluding
    that the claim there was preempted by the FDCA. *Id.* at 1122. While the Court also referred to

21  the FDA's view that in some circumstances the lack of a reference statement could be misleading,
    that view is not governing here for the reasons P&G explained in its earlier briefing. *See* Doc. 20,

22  p. 12-13; Doc. 41, p. 12-13. The FDA's regulations are educational, prophylactic and general in
    nature and do not determine what is false or misleading in a given case for false advertising

23  purposes.

24  [4]   *See, e.g.*, *Freeman v. Time, Inc.*, 68 F.3d 285, 289-90 (9th Cir. 1995); *Hairston v. S. Beach
    Beverage Co.*, No. 12-cv-1429, 2012 WL 1893818, at *4 (C.D. Cal. May 18, 2012) ("[W]here a

25  Court can conclude as a matter of law that members of the public are not likely to be deceived by
    the product packaging, dismissal is appropriate."); *Herrington v. Johnson & Johnson Consumer

26  Cos., Inc.*, No. 09-cv-1597, 2010 WL 3448531, at *7 (N.D. Cal. Sept. 1, 2010) (dismissing CLRA
    claim in part because plaintiffs did not plead facts indicating that the representations at issue were

27  false or misleading); *Rooney v. Cumberland Packaging Corp.*, No. 12-CV-0033, 2012 WL

28                                                                    (continued)

Mot. to Dismiss Second Amended Complaint
                                                              No. 12-cv-01891-PSG

must consider the plausibility of the claim in light of the nature of the product.  In *Red v. Kraft Foods, Inc.*, No. 10-cv-1028, 2012 WL 5504011, at *3 (C.D. Cal. Oct. 25, 2012), for example, the court ruled that no reasonable consumer would conclude that "a cracker is . . . composed of primarily fresh vegetables . . . [merely] because the packaging boasts that the crackers are made with real vegetables and depicts vegetables."  Likewise, no reasonable consumer would conclude that potato snack chips are healthy simply because they do not contain one type of fat.  To reach that conclusion, a consumer would need to "disregard 'well-known facts of life'"—that snack foods are not health foods—something courts have held *reasonable* consumers would not do.  *Id.* at *3.[5]

Courts must also consider the label as a whole.[6]  Here, the Pringles label as a whole confirms that a reasonable consumer would not be misled by the true statement "0g trans fat."

---

1512106, at *4-5 (S.D. Cal. Apr. 16, 2012) (granting motion to dismiss because "a reasonable consumer could not be led to believe that Sugar in the Raw contains unprocessed and unrefined sugar"); *Werbel v. PepsiCo, Inc.*, No. 09-cv-04456, 2010 WL 2673860, at *3, *5 (N.D. Cal. July 2, 2010) (granting motion to dismiss because "no reasonable consumer would be deceived into believing that Cap'n Crunch 'has some nutritional value derived from fruit'" (citation and internal quotation marks omitted)); *Videtto v. Kellogg USA*, No. 2:08-cv-01324, 2009 WL 1439086, at *3 (E.D. Cal. May 21, 2009) (granting motion to dismiss because "it is entirely unlikely that members of the public would be deceived" that Froot Loops cereal contains actual fruit).

[5]    *See also Carrea v. Dreyer's Grand Ice Cream, Inc.*, 475 F. App'x 113, 115 (9th Cir. 2012) (unpublished) ("it strains credulity to claim that a reasonable consumer would be misled to think that an ice cream dessert . . . is healthier than its competitors simply by virtue of these 'Original' and 'Classic' descriptors"); *Williamson v. Apple*, No. 11-cv-00377, 2012 WL 3835104, at *6 (N.D. Cal. Sept. 4, 2012) ("the representations taken as a whole would not lead the 'reasonable consumer' to believe that the glass housing on the iPhone 4 was indestructible or drop-proof because . . . it is a well-known fact of life that glass can break under impact, even glass that has been reinforced"); *Viggiano v. Hansen Natural Corp.*, No. 12-cv-10747, 2013 WL 2005430, at *9 n.38 (C.D. Cal. May 13, 2013) ("a reasonable consumer would understand that a diet soda—even one with a label stating that it has 'all natural flavors'—contains artificial sweeteners").

[6]    *Henderson v. Gruma Corp.*, No. 10-cv-04173, 2011 WL 1362188, at *12 (C.D. Cal. Apr. 11, 2011) (dismissing UCL, FAL, and CLRA claims where challenged statement was "accurate in the context of the label as a whole, and unlikely to deceive a reasonable consumer"); *Hairston*, 2012 WL 1893818, at *4 (reasonable consumer test not analyzed based on "a single out-of-context phrase found in one component of [a product's] label"); *McKinnis v. Sunny Delight Beverages Co.*, No. 07-cv-02034, 2007 WL 4766525, at *4 (C.D. Cal. Sept. 4, 2007) (reviewing "label as a whole").

Mot. to Dismiss Second Amended Complaint
                No. 12-cv-01891-PSG

The label contains a Nutrition Facts box disclosing the snack's nutrient content, including its fat content. Doc. 90, Exs. 1, 8. The Nutrition Facts box is quite prominent—more so than the "0g trans fat" statement. *Id.* Courts have held that where, as here, there is no front-of-packaging affirmative misrepresentation and the label accurately discloses the nutrition facts and ingredients, no reasonable consumer could be misled about a product's contents.[7] For example, in *McKinnis*, the court concluded that "no reasonable consumer, upon review of the label as a whole . . . would conclude that Defendant's products contain significant quantities of fruit or fruit juice," simply because the labels depict pictures of fruit, "particularly when the label identifies the product as fruit 'flavored' and indicates the exact fruit content of each product." 2007 WL 4766525, at *4. Similarly, here, no reasonable consumer could be misled to believe that Pringles contain no fat by the true statement "0g trans fat," given that the label "indicates the exact [fat] content of [the] product." *Id.*

In *Freeman*, Ninth Circuit upheld the dismissal of a challenge to a mailer that suggested the plaintiff had won a million dollar sweepstakes because the mailer explicitly stated "the conditions which must be met in order to win." 68 F.3d at 289. Because "no reasonable reader could ignore" that language, the advertisement was not likely to deceive a reasonable consumer. *Id.* So too here, the information in the Nutrition Facts box makes "it impossible for the plaintiffs to prove that a reasonable consumer was likely to be deceived" by the true statement "0g trans fat." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008) (describing *Freeman*).[8]

Moreover, even viewed in isolation, the "0g trans fat" statement cannot reasonably be read to mean Pringles are fat free, or low in all types of fats. As noted above, reasonable consumers would expect such products to be labeled "0g fat," "fat-free," or "low fat," which Pringles are not.

---

[7]   *See Hairston*, 2012 WL 1893818, at *5 (label not deceptive as a matter of law where the product's "ingredient list is consistent with the front label statement"); *Viggiano*, 2013 WL 2005430, at *9 n.38 ("As there are no artificial flavors in Hansen's diet soda, as reflected on the statement of ingredients, labeling the product 'all natural flavors' is not misleading as a matter of law").

[8]   Because the "0g trans fat" representation is undisputedly true, *Williams*, which involved packaging with statements and pictures "potentially suggesting … *false*" messages, does not apply. 552 F.3d at 939 (emphasis added).

1   Rather, the label refers only to trans fat, correctly suggesting that other fats are present.  *See Lam*

2   *v. Gen. Mills, Inc.*, 859 F. Supp. 2d 1097, 1103-04 (N.D. Cal. 2012) ("[a] reasonable consumer is

3   unlikely to interpret the statement 'gluten free' to mean that the [product is] . . . healthful," as it

4   "communicates nothing more than the absence of gluten").

5       Because a reasonable consumer is not likely to be misled by the accurate "0g trans fat"

6   statement, plaintiffs' false advertising claim based on that statement must be dismissed.

7       **B.    All The Defects The Court Identified In Plaintiffs' "Wholesome Ingredients"**

8           **Claim Persist, Requiring Dismissal Of That Claim.**

9       This Court dismissed plaintiffs' "wholesome" claim against P&G because plaintiffs failed

10  to "provide the entire statement" on which the claim is based, or show "where the statement [was]

11  found, and how Plaintiffs were actually misled" by it.  Doc. 89, p. 20.  Plaintiffs have made no

12  effort to cure any these defects.

13      First, plaintiffs still do not "provide the entire [wholesome ingredient] statement."  *Id.*

14  Instead, they allege only that "Defendants stated . . . that their Pringles snack chip products were

15  made with 'wholesome ingredients.'"  Doc. 90 ¶ 92.  This is the same thing they said previously.

16  Doc. 25 ¶ 84 ("Defendants stated that their Pringles products were made with 'wholesome

17  ingredients'").  For this reason alone, their "wholesome" claim must be dismissed.  *See* Doc. 89,

18  p. 20; *Ries v. Hornell Brewing Co.*, No. 5:10-cv-01139, 2011 WL 1299286, at *4 (N.D. Cal. Apr.

19  4, 2011) (dismissing under Rule 9(b) deceptive product labeling claims based on advertisements,

20  marketing, or labels not before the Court); *Hovsepian v. Apple, Inc.*, No. 08-5788, 2009 WL

21  2591445, at *3 (N.D. Cal. Aug. 21, 2009) ("vague references" to statements alleged to have been

22  made "on [defendant's] website … do not provide the 'the who, what, when, where, and how' of

23  the misconduct charged'").

24      Second, plaintiffs still do not allege with sufficient particularity where the "wholesome"

25  claim appeared.  They assert only that the statement appeared "on [P&G's] websites" (Doc. 90

26  ¶ 92), without identifying when or where on that website the statement was supposedly posted.

27      Third, plaintiffs do not allege that "the [Pringles] label contains a specific statement

28  referring the consumer to a specific website for information about the [wholesome] claim," as this

Mot. to Dismiss Second Amended Complaint
                                        No. 12-cv-01891-PSG

1    Court held they must to assert a claim based solely on a website statement.  Doc. 89, pp. 20-21;

2    *see also Wilson*, 2013 WL 1320468, at *14 (same).[9]

3         Fourth, plaintiffs have added no substantive allegations to address this Court's ruling that

4    they failed to allege "how [they] were actually misled" by the "wholesome" statement.  Doc. 89,

5    p. 20.  They simply have reiterated the exact same allegations in more paragraphs.  *Compare* Doc.

6    25 ¶¶ 83-85 *with* Doc. 90 ¶¶ 90-95.

7         Finally, plaintiffs' "wholesome" claim must be dismissed for the independent reason that

8    plaintiffs do not allege that they ever viewed the Pringles website.  As such, they cannot allege

9    reliance, and lack standing under the UCL, CLRA, and FAL to assert the "wholesome" claim.

10   *See Bronson v. Johnson & Johnson, Inc.*, No. 12-cv-04184, 2013 WL 1629191, at *2-3 (N.D. Cal.

11   Apr. 16, 2013) (where plaintiffs "never allege[d] they relied on the website or print

12   advertisements," they lacked "standing to challenge Defendants' web and print advertising" under

13   the UCL, FAL, or CLRA).

14

15

16   _____

17   [9]     As this Court ruled, website advertising does not constitute "labeling" under the FDCA.
     Doc. 89, pp. 20-21.  *See* 21 U.S.C. § 321(m) (defining labeling); *compare* 21 U.S.C. § 343(a)
18   (FDCA prohibits misleading labeling of conventional foods, but not misleading advertising), *with*
     15 U.S.C. § 55(a) ("false advertisement[s]" subject to FTC regulation do not include "labeling").
19   Plaintiffs try to evade that ruling by citing informal FDA guidance.  Doc. 90 ¶ 140.  But that
     guidance shows that Pringles website is not part of the label.  The guidance states that websites
20   can be considered labeling if the label states that the website provides "additional information
     about a claim for the product."  No such statement appears on the Pringles label.  Nor are
21   plaintiffs helped by the warning letters they cite.  Such warning letters are not formal statements
     of the FDA's policy and are not binding even on the FDA, let alone the courts.  *See* 21 C.F.R. §
22   10.85(k); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943-44 (D.C. Cir. 2012)
     (warning letters "neither mark the consummation of the agency's decision-making process nor
23   determine [any person's] legal rights or obligations.") (quoting FDA, Regulatory Procedures
     Manual, § 4-1-1); *Cytosport, Inc. v. Vital Pharm., Inc.*, 894 F. Supp. 2d 1285, 1294 (E.D. Cal.
24   2012) ("FDA warning letters are informal and advisory").  Moreover, by statute, a guidance
     document may be modified only through a notice-and-comment procedure, not through warning
25   letters.  21 U.S.C. § 371(h)(1)(C), (D).  And warning letters are certainly not enough to overcome
     the clear language of the governing statute and the Supreme Court and Ninth Circuit's decisions
26   on what constitutes labeling.  *Kordel v. United States,* 335 U.S. 345, 349-50 (1948); *Alberty Food
     Prods. Co. v. United States*, 185 F.2d 321, 324-25 (9th Cir. 1950).
27

28

Mot. to Dismiss Second Amended Complaint
                                              No. 12-cv-01891-PSG

C.     **Plaintiffs Do Not Allege Facts Showing that Pringles Contained Any Non-Functional Slack-Fill.**

This Court declined to dismiss plaintiffs' slack fill claim on the ground that plaintiffs had alleged facts showing that they "thought they were receiving more of the product than they actually received," which the Court concluded created a "debatable factual question that is inappropriate to resolve at the motion to dismiss stage." Doc. 89, pp. 19-20.

The Court did not address, however, the more fundamental problem with the slack-fill claim: plaintiffs do not allege any facts as to (1) the amount of any supposed empty space in the Pringles container and (2) the degree to which any such space is non-functional. Both are critical elements of a claim of slack-fill packaging. The regulation plaintiffs invoke, 21 C.F.R. § 100.100, prohibits only "non-functional slack-fill" and provides a list of the circumstances in which empty space is considered functional, including where necessary to protect the contents of the package or to facilitate handling. Plaintiffs' boilerplate, conclusory allegations address none of this. If there really were empty space in the container, and if it really were non-functional, it would be an easy matter for plaintiffs to allege facts to the effect. Because they instead allege only "a formulaic recitation of the elements of a cause of action" without any supporting facts, their complaint is insufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).[10]

## III.   **PLAINTIFFS FAIL TO STATE A UCL "UNLAWFUL" CLAIM.**

Plaintiffs' alternative theory of liability—advanced in "the 'UCL unlawful' part" of their case—is that the Pringles label violated FDA regulations, and that those violations are actionable under the UCL's unlawful prong even without any "deception by [P&G], or review of or reliance on the labels by Plaintiffs." Doc. 90 ¶¶ 4, 7. According to plaintiffs, to obtain a full refund, all they "need to show is that they bought an unlawful product." *Id.* ¶ 7.

---

[10]    Nowhere in the AC do the plaintiffs allege that they thought they were receiving more of the product than they actually received. Nor is there any such allegation in the SAC, suggesting that the plaintiffs do not intend to offer such proof. But, even putting that aside, the SAC is still insufficient for lack of facts—as opposed to conclusions—showing the existence and non-functionality of any empty space.

1    This misbranding theory fails as well, for at least three reasons. *First*, the California

2    Supreme Court has ruled that plaintiffs cannot use the "unlawful" prong of the UCL to escape the

3    requirements governing "fraudulent conduct" claims when the unlawful conduct is a violation of

4    a consumer disclosure law. *Second*, plaintiffs cannot allege any economic injury caused by the

5    alleged regulatory violations, and thus lack standing to assert the misbranding claim. *Third*,

6    federal law bars private enforcement of the FDA regulations that are at the heart of plaintiffs'

7    complaint, particularly where plaintiffs allege no deception.

8    **A.    Plaintiffs Must Establish Deception and Reliance Even For Their "Unlawful**

9    **Conduct" Claim.**

10   In *Kwikset,* the plaintiffs advanced the same basic "unlawful conduct" theory plaintiffs

11   advance here. They alleged that the defendant violated California Business and Professions Code

12   section 17533.7, which prohibits advertising a product as being "Made in the U.S.A." if a

13   substantial part of the product was made outside of the United States. 51 Cal. 4th at 317. As with

14   the food labeling regulations plaintiffs invoke here, section 17533.7 makes it "unlawful . . . to

15   sell" any such mislabeled products. Thus, like the plaintiffs here, the *Kwisket* plaintiffs asserted

16   claims under both the "fraudulent" prong of the UCL and the "unlawful" prong. *Id.* And they

17   argued with respect to their "unlawful conduct" claim that the requirements for a fraudulent

18   conduct claim were inapplicable because "the violation is measured solely by the defendant's

19   conduct, not by any other party's reliance on that conduct." Opening Brief on the Merits of Real

20   Parties in Interest, *Kwikset Corp. v. Super. Ct.*, 2009 WL 2954740, at *18 (Aug. 11, 2009).

21   The Supreme Court rejected that argument. Even though the plaintiff alleged a UCL

22   "unlawful conduct" claim in addition to a claim of "fraudulent conduct," the Court ruled that the

23   standards governing deceptive conduct claims applied because the alleged unlawful conduct was

24   a violation of a statutory provision governing disclosures to consumers. *Kwikset*, 51 Cal. 4th at

25   326 n.9. Thus, the Court found standing in *Kwikset* because the plaintiffs alleged that they were

26   "deceived by [the] product's label." *Id.* at 316. The Court held that the UCL permits suit by a

27   "consumer who relies on a product label and challenges a misrepresentation contained therein."

28   *Id.* at 330.

1    Plaintiffs here have not satisfied the *Kwikset* standard.  Just as in *Kwikset*, the alleged

2    unlawful conduct here is a violation of regulations that plaintiffs assert were adopted to prevent

3    consumers from being deceived.  Accordingly, plaintiffs cannot proceed unless they sufficiently

4    allege both deception and reliance.  But unlike *Kwikset*, they have not done so.  As discussed

5    above, they have not shown that they were actually deceived by the Pringles' label or, indeed, that

6    the label contains any misrepresentations at all.

7    The cases plaintiffs cite in their SAC do not hold otherwise.  Many of them address the

8    proof requirements for absent class members, not for named class representatives such as

9    plaintiffs.[11]  In others, the theory of injury was that the unlawful conduct resulted in the plaintiff

10   paying an excessive price for the product, not merely that the product or the seller violated a

11   regulatory requirement.[12]  None of them hold that deception or reliance is irrelevant when the

12   underlying "unlawful conduct" is a violation of a consumer disclosure law.  No such holding

13   would be consistent with *Kwikset*.

14   Trying to shoehorn themselves within *Kwikset*'s deception rationale, plaintiffs allege that

15   they would not have purchased Pringles had they known the product was misbranded.  Doc. 90

16   ¶¶ 162-66.  But this theory fails because plaintiffs allege no facts that would support any claim

17   that P&G had a duty to disclose to consumers whether its products are out of compliance with

18   food labeling regulations.  Absent such a duty, no valid claim of deception sufficient to satisfy

19   *Kwikset* can exist based on alleged misbranding.

21   [11]    *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011); *In re Steroid Hormone
22   Prod. Cases*, 181 Cal. App. 4th 145, 156 (2010); *In re Tobacco II Cases*, 46 Cal. 4th 298, 325,
n.17 (2009); *Ries v. Ariz. Beverages USA, LLC,* 287 F.R.D. 523 (N.D. Cal. 2012).

23   [12]    *Medrazo v. Honda of N. Hollywood*, 205 Cal. App. 4th 1, 12 (2012) (motorcycle dealer
24   failed to display "hanger tag" that listed dealer-added charges to the purchase price, resulting in
plaintiff being harmed by paying the undisclosed charges); *Olivera v. Am. Home Mortg.
25   Servicing, Inc.*, 689 F. Supp. 2d 1218 (N.D. Cal. 2010) (allegedly excessive interest on mortgage
loan); *Rand v. Am. Nat'l Ins. Co.*, No. 09-cv-063951, 2010 U.S. Dist. LEXIS 82584 (N.D. Cal.
26   June 22, 2010) (allegedly overpriced annuity and surrender charges); *In re Ditropan XL Antitrust
Litig.*, 529 F. Supp. 2d 1098 (N.D. Cal. May 11, 2007) (defendants alleged engaged in
27   anticompetitive conduct that excluded competing generic drugs and raised prices for the
defendant's drug).

- 17 -        Mot. to Dismiss Second Amended Complaint
No. 12-cv-01891-PSG

If adopted, plaintiffs' misbranding theory would effectively override the entire law regarding a seller's duty to disclose.  A seller would have to disclose to consumers whenever the seller is in violation of any regulation pertaining to the product or the seller's ability to sell it, no matter unrelated the violation to the product's quality or price.  Absent such a disclosure, any purchaser of the product would be entitled to a full refund of the purchase price, so long as the purchaser was willing to say that she would not have bought the product had she known.  But there is no reason to believe that the Legislature intended the UCL to have that effect.  If anything, Proposition 64 was adopted to preclude any such result, by eliminating the earlier practice of plaintiffs bringing suit based solely on a violation of some regulatory requirement without any showing that the plaintiff was actually injured by the violation.

      **B.**     **Plaintiffs Cannot Establish Economic Injury Based Solely On The Purchase Of An Allegedly "Unlawful" Product.**

Even if deception and reliance were not required, plaintiffs' theory that the mere purchase of an unlawful product, standing alone, can support a UCL claim has been repeatedly rejected.  Both state and federal courts have held that an allegation that the plaintiff bought a product that was sold in violation of a regulatory requirement does not by itself allege the kind of economic injury that is required to establish UCL standing.  *See In re Actimmune Mktg. Litig.*, No. 08-cv-02376, 2010 WL 3463491 at *9 n.2 (N.D. Cal. Sep. 1, 2010) (alleged misbranding of drugs not sufficient to state a claim of UCL injury absent a misrepresentation or proof that the drug was not effective); *Myers-Armstrong v. Actavis Totowa, LLC*, No. 08-cv-04741, 2009 WL 1082026, at *4 (N.D. Cal. Apr. 22, 2009) ("California [UCL] law does not allow a civil lawsuit to recover the purchase price for medicine . . . merely because the consumer would not have purchased it had he or she known that the medicine came from a plant whose quality-control had been compromised"); *Herrington v. Johnson & Johnson Consumer Cos., Inc.*, No. 09-cv-1597, 2010 WL 3448531 at *4 (N.D. Cal. Sep. 1, 2010) (plaintiffs lacked UCL standing where they alleged "that they unknowingly purchased products containing potential carcinogens and that 'they would have never purchased these products had they known of the presence of these contaminants'"); *Olson v. Cohen*, 106 Cal. App. 4th 1209, 1214 (2003) (affirming dismissal of UCL claim against

Mot. to Dismiss Second Amended Complaint
No. 12-cv-01891-PSG

1    legal corporation premised on noncompliance "with one of the requirements for operating as a

2    law corporation," because plaintiffs made "no allegation that any client relied upon the existence

3    of a corporate entity in seeking legal services" and "[t]here [wa]s no allegation of malpractice").

4         As these decisions recognize, whether or not reliance is required, every claim under the

5    UCL requires that the plaintiff show economic injury and causation—*i.e.*, that the plaintiff "lost

6    money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204;

7    *Kwikset*, 51 Cal. 4th at 322, 326.  Merely asserting that the product was unlawful because it

8    violated some regulatory requirement does not satisfy that requirement.  Buying a non-defective

9    product that is exactly what the seller represented it to be is not by itself economic injury, even if

10   the seller violated some law in selling it.  As the courts have repeatedly recognized, finding

11   economic injury in that circumstance "would all but eviscerate the economic injury requirement

12   in cases brought under the 'unlawful' prong since they are commonly, and by definition, based on

13   predicate violations of state law." *Baird v. Sabre, Inc.*, No. 2:13-cv-00999, 2013 BL 201323, at

14   *4 n.3 (C.D. Cal. July 25, 2013); *see also Boorstein v. Men's Journal LLC*, No. 12-cv-771, 2012

15   WL 2152815, at *4 (C.D. Cal. June 14, 2012) ("[i]f injury exists based solely on the consumer's

16   expectation that the defendant will not violate a law, then injury exists in any situation where a

17   business violates a law, regardless of whether there is actual harm to the consumer."); *Miller v.*

18   *Hearst Commc'ns, Inc.*, No. 12-cv-0733, 2012 WL 5439897, at *1 (C.D. Cal. Nov. 7, 2012)

19   (same).  And even if buying an as-represented product could be economic injury (it cannot),

20   plaintiffs allege no causal connection between P&G's allegedly unlawful conduct—

21   misbranding—and their decision to purchase Pringles over some other snack food.  Instead, they

22   disavow the most commonly alleged causal mechanism—reliance on misleading statements.

23        In its order on the AC, this Court ruled that plaintiffs had sufficiently alleged standing

24   because they alleged that they had "pa[id] a higher price for a falsely advertised product."  Doc.

25   89, p. 7.  For their "unlawful" conduct claim, however, plaintiffs renounce any assertion that the

26   product was "falsely advertised," thus eliminating that rationale as a basis for finding standing as

27   to that claim.  Moreover, plaintiffs have not in any event sufficiently pled facts supporting their

28   conclusion that they paid a "premium price" for Pringles.  Doc. 90 ¶ 164.  Among other things,

1  they do not allege how much they paid for Pringles, the price of Pringles generally, or the price of

2  any allegedly comparable products.  Nor do they allege any facts suggesting that the alleged

3  misbranding (apart from any deception regarding the product itself) could plausibly result in a

4  higher price for Pringles.  To the contrary, it is highly ***implausible*** that a non-deceptive

5  misbranding of a food product could possibly lead to a higher price.  Because the conclusory

6  allegation that plaintiffs paid a premium must be disregarded (*Iqbal*, 556 U.S. at 678), they do not

7  sufficiently allege economic injury, and accordingly lack standing.

8          **C.**      **Plaintiffs' Unlawful Prong Claim—Which Is Not Based On Deception— Is**

9                  **Preempted.**

10      Plaintiffs' misbranding claim also must be dismissed because federal law preempts it.

11  This Court's conclusion in its ruling on the AC that plaintiffs' claims are not preempted was

12  based on the premise that those "claims vindicate the separate and independent right to be free

13  from deceptive and misleading advertising" (Doc. 89, p. 15) and that plaintiffs were "suing

14  because the [label] claims are misleading and deceptive under California law, not merely because

15  Defendants' products violate the FDCA" (*id.*, 16).  But plaintiffs' SAC makes clear that their

16  UCL unlawful prong claim does ***not*** seek to "vindicate the separate and independent right to be

17  free from deceptive and misleading advertising" and does ***not*** allege that "the [label] claims are

18  misleading and deceptive under California law."  Rather, the claim rests on "'misbranding' . . .

19  ***alone*** without any allegations of deception by Defendants, or review of or reliance on the labels

20  by Plaintiffs."  Doc. 90 ¶ 7 (emphasis added).  The Court's ruling does not establish that such a

21  claim—premised on technical FDCA violations only, not any deception—survives preemption.

22  For the reasons below, it does not.

23      The theory underlying "the 'UCL unlawful' part" of plaintiffs' case—that they can sue for

24  alleged FDA regulatory violations regardless of the FDA's view on enforcement—is precisely the

25  sort of conflict that led the Supreme Court to find preemption in *Buckman v. Plaintiffs' Legal*

26  *Comm.*, 531 U.S. 341 (2001), and the Ninth Circuit to do the same in *Perez v. Nidek Co., Ltd.*,

27  711 F.3d 1109, 1119 (9th Cir. 2013).  *Buckman* and *Perez* hold that a state-law claim that

28  "exist[s] solely by virtue of the FDCA . . . requirements" is preempted.  *Perez*, 711 F.3d at 1119

Mot. to Dismiss Second Amended Complaint
No. 12-cv-01891-PSG

(*quoting Buckman*, 531 U.S. at 353).  Put differently, where plaintiffs do not rely "on traditional state tort law which had predated the federal enactments in question[]," their claims are preempted.  *Buckman*, 531 U.S. at 353.

Plaintiffs' unlawful prong misbranding claim fits squarely into this preempted category.  Plaintiffs **admit** the claim does not rely on traditional state tort law, such as that designed to prevent deceptive and misleading advertising, that predated the FDCA.  Doc. 90 ¶ 7.  Rather, the misbranding claim is premised on provisions of the Sherman Law that were enacted after the FDCA and that merely incorporate the FDCA and its accompanying regulations into California law.  Because the Sherman Law provisions at issue "exist solely by virtue of the FDCA," so too must plaintiffs' claim exist "solely by virtue of the FDCA."  *Buckman*, 531 U.S. at 353.  As such, it is preempted.  *Id.*; *Perez*, 711 F.3d at 1119.

This conclusion is consistent with—and indeed compelled by—the structure of the statute.  While states are permitted to adopt parallel regulations, the same statute that bestowed that power carefully circumscribed it by adding a provision that limited enforcement to the state itself.  Nutrition Labeling and Education Act of 1990, Pub. L. No. 101-535, § 4, 104 Stat. 2353 (1990) ("State Enforcement").  While states are certainly free (as this Court ruled) to allow private enforcement of their traditional tort laws prohibiting deception, the statutory scheme forecloses any conclusion that states may allow private enforcement of the regulations themselves without any proof of deception.[13]

---

[13]      As they did in AC, plaintiffs allege that P&G violated other provisions of the Sherman Law beyond California Health & Safety Code § 110665, the provision that incorporates the FDA regulations.  *See* Doc. 90 ¶¶ 142-157.  The laundry list of provisions alleged to have been violated is identical to the one in the amended complaint (Doc. 25 ¶¶ 117-24), but for three additions—sections 110430 (making it unlawful to advertise misbranded food by representing it to have any effect on conditions, disorders or diseases), 11725 (regarding use of the common or usual name for ingredients), and 110740 (regarding disclosure of artificial flavoring, artificial coloring and chemical preservatives).  Doc. 90 ¶¶ 145, 150, 154.  There are no facts alleging the Pringles label violates these new provisions, nor does it.  The remaining provisions, save one, merely prohibit false or deceptive labeling or misbranding of foods.  As shown above, the Pringles label is not false or deceptive.  And the allegations that Pringles are misbranded in violation of FDA regulations are not actionable, as those regulations may not be the enforced in a private lawsuit under section 337.  The only other Sherman Law provision plaintiff cites is Cal. Health & Safety
(continued)

1
2

**IV.     PLAINTIFFS' "0G TRANS FAT" CLAIMS AS TO PRINGLES REDUCED FAT**
**AND PRINGLES 100 CALORIE PACKS INDEPENDENTLY FAIL.**

3       The second amended complaint asserts new claims based on Pringles Reduced Fat

4    Original, Pringles Reduced Fat Sour Cream and Onion, Pringles Original 100 Calorie Packs, and

5    Pringles Sour Cream and Onion 100 Calorie Packs.  Doc 90 ¶ 51.  As with the other varieties and

6    flavors of Pringles at issue, plaintiffs allege those products must bear the 21 C.F.R. § 101.13(h)

7    disclosure next to the statement "0g trans fat."  *Id.* ¶ 52.  In addition to all the reasons stated

8    above with regard to the complaint generally, these new claims fail for the independent reason

9    that the Reduced Fat and 100 Calorie Pack products do not contain "more than 13.0 g of fat . . .

10   per 50 g" serving, as required to trigger the 21 C.F.R. § 101.13(h) disclosure requirement.  As the

11   labels attached to plaintiffs' complaint show, Pringles Reduced Fat Original, Pringles Reduced

12   Fat Sour Cream and Onion, and Pringles Original 100 Calorie Packs contain 12.5 g of fat per 50 g

13   serving, while Pringles Sour Cream and Onion 100 Calorie Packs contain 8.03 g of fat per 50 g

14   serving.  Doc 90, Ex. 8.  Because those exhibits are part of the complaint (Fed. R. Civ. P. 10(c)),

15   plaintiffs have pled themselves "'out of court'" by "plead[ing] facts which establish that [they]

16   cannot prevail on [their] . . . claim[s]" based on Reduced Fat and 100 Calorie Pack varieties of

17   Pringles.  *Weisbuch v. Cnty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997).

18
19
20
21
22
23
24
25
_____

Code § 110735 (also mis-cited as § 110755).  Doc. 90 ¶¶ 151, 153.  But that section is limited to
26   foods represented to be for "special dietary uses" and plaintiffs allege no facts showing Pringles
fall into that category; there is no representation that Pringles labels advertised the product as
27   particularly suitable for treating disease, for people trying to lose weight, for babies, etc.  *See* 21
C.F.R. § 105.3(a)(1) (defining "special dietary uses").
28

Mot. to Dismiss Second Amended Complaint
No. 12-cv-01891-PSG

1

## <u>CONCLUSION</u>

2          For these reasons, plaintiffs' second amended complaint should be dismissed with

3  prejudice.

4  Dated: August 16, 2013                    JONES DAY

5

6                                            By:  /s/ Craig E. Stewart
                                                  Craig E. Stewart
7
                                             Counsel for Defendant
8                                            THE PROCTER & GAMBLE CO.

9

10  SFI-834777v3

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mot. to Dismiss Second Amended Complaint
                                             No. 12-cv-01891-PSG